Argued and submitted March 10, judgments of conviction and sentences of death affirmed; case remanded to circuit court for further proceedings May 11, reconsideration denied August 1, 2006

# STATE OF OREGON,
*Respondent,*

*v.*

# GREGORY ALLEN BOWEN,
*Appellant.*

## (CC 02CR0019; SC S50491)

135 P3d 272

Robin A. Jones, Senior Deputy Public Defender, argued the cause for appellant. With her on the briefs were Peter Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services, Salem.

Kaye E. McDonald, Assistant Attorney General, argued the cause for respondent. With her on the briefs were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Carolyn Alexander and Steven R. Powers, Assistant Attorneys General, Salem.

DE MUNIZ, C. J.

## DE MUNIZ, C. J.

This case is before the court on automatic and direct review of defendant's judgments of conviction and sentences of death, pursuant to ORS 138.012(1). Defendant was convicted on two counts of aggravated murder and 16 additional felony convictions. On review, defendant raises numerous assignments of error and asks this court to reverse and remand his case for a new trial or, alternatively, vacate his sentences of death and remand for resentencing. For the reasons set out below, we affirm defendant's convictions and sentences of death, and remand for entry of a corrected judgment of conviction consistent with this opinion.

Because the jury found defendant guilty, we view the evidence presented at trial in the light most favorable to the state. *State v. Thompson*, 328 Or 248, 250, 971 P2d 879 (1999).

## I. FACTS AND PROCEDURAL BACKGROUND

On December 25, 2001, defendant, along with his friend Mike Colby, left Crescent City in search of temporary work on the coast. After spending the night in Coos Bay, defendant and Colby traveled to Charleston hoping to find work on a fishing boat; they were also looking for drugs. At the time, defendant habitually used methamphetamine, as well as other illegal drugs. Unable to obtain either employment or drugs, defendant and Colby continued on to Newport and Warrenton.

On December 29, 2001, defendant and Colby traveled to Gold Beach, where they began experiencing problems with their vehicle. While in Gold Beach, defendant decided to visit his ex-girlfriend, Bridget Dalton. Upon arriving at Dalton's house, defendant told her that he wanted to pick up some extra clothes and give her money that he owed her. After entering the house, however, defendant and Dalton began to argue. During that argument, defendant struck Dalton in the face with his fist, knocking her to the floor. He then grabbed Dalton by her hair, pulling her up from the floor, and proceeded to hold a knife to her throat. Defendant then took Dalton into the bedroom and exchanged his knife

for a black-powder pistol, which he used to repeatedly to beat Dalton. During that altercation, Dalton grabbed the barrel of the pistol and cut her hand on the gunsights. Shortly thereafter, someone knocked on Dalton's front door. Defendant told Dalton that, if she made a sound, he would shoot the person at the front door. After defendant left the bedroom to check the front door, Dalton escaped the house by jumping through a bedroom window. As Dalton ran to her neighbor's house, she yelled for someone to call the police. In response, defendant and Colby fled to a friend's house to listen to a police scanner.

While at the friend's house, defendant heard nothing on the police scanner regarding the incident with Dalton. Defendant and Colby then visited their heroin supplier, but discovered the supplier was not home. Defendant and Colby then traveled to the home of another of defendant's friends, Donald Christiansen (the victim). Upon arriving at the victim's house, Colby and defendant left their vehicle running and met the victim on his front porch. The victim allowed them inside, and all three men sat down at the kitchen table. While seated, defendant removed the black-powder pistol from his pocket and placed it on the kitchen table. Defendant asked the victim if he had any money. The victim answered "no," which prompted defendant to inquire about a bowl of money sitting on the counter. The victim informed defendant that the bowl contained only coins.

The victim and defendant got up from the kitchen table and moved to the living room to talk. Defendant left the pistol on the kitchen table. Colby remained at the kitchen table until he heard their vehicle making strange noises outside. Defendant asked Colby to step outside and check on it. After checking on the vehicle, Colby remained outside to smoke a cigarette.

Defendant testified at trial that, after returning to the kitchen and while Colby was outside, he informed the victim about his earlier altercation with Dalton. Concerned about defendant's well-being, the victim offered to call the police and encouraged defendant to turn himself in. Defendant further testified that, as the victim prepared to call the police, defendant grabbed the gun and said, "If you call 911[,]

I may as well just shoot myself and get it over with." According-ing to defendant, the victim attempted to take the gun away from defendant and during the struggle, the gun accidentally went off. The bullet entered the victim's chest above his left nipple and traveled downward, deflected off a rib and pierced the victim's heart and liver.

After hearing the gunshot, Colby rushed back inside the victim's house. Colby saw the victim on the floor and heard defendant tell the victim that "It will be over shortly. I got you in the heart." Colby asked, "Fuck, Buck, what happened?" In response, defendant looked at Colby and asked, "Are you all right with this?" Colby then went outside to the vehicle and waited. Soon thereafter, Colby watched as defendant came out of the victim's house carrying several guns and a box with a phone in it.[1] After leaving the victim's home, defendant and Colby returned to Crescent City in search of heroin.

The following day, a neighbor discovered the victim's body and called the police. Shortly thereafter, a police officer arrived and determined that the victim was "obviously deceased" and that the scene revealed "obvious foul play." Several other police officers arrived. Those police officers took photographs, turned the body over, and cut open the victim's shirt with a pair of scissors. Upon further investigation, police officers discovered blood splatter low on the wall and framing of the doorway between the living room and kitchen, low-angle blood splatter on and under a cart just inside the kitchen, and blood smears on the kitchen floor and on a white telephone. The officers indicated that the home appeared "appropriately cluttered" and displayed no evidence of ransacking.

The state subsequently charged defendant in an 18-count indictment as a result of the crimes that occurred on the night of December 29, 2001. One group of crimes involved defendant's ex-girlfriend Dalton, and the second group of crimes involved the victim. Defendant pleaded guilty to all

---

[1] At trial, defendant offered testimony to the contrary. Defendant testified that, following the shooting, he went outside, got sick over the balcony, and then sat down on the porch and cried. According to defendant, Colby told him that they needed to go and that the guns were in the vehicle when he got in.

charges involving Dalton. As relevant to this court's review of the charges involving the victim, defendant was indicted on two counts of aggravated murder, one based on the theory that he intentionally and personally had caused the death of the victim during a robbery, and the other based on the theory that he intentionally and personally had caused the death of the victim during a burglary. A jury ultimately convicted defendant on both counts of aggravated murder.

Based on the aggravated murder verdicts, the trial court held a penalty-phase proceeding. On each count, the jury answered "yes" to the statutory questions submitted to it.[2] At the subsequent sentencing hearing, the court imposed a sentence of death on both aggravated murder convictions. This automatic review followed.

## II. ASSIGNMENTS OF ERROR REGARDING PRETRIAL ISSUES

Defendant raises seven assignments of error that pertain to his pretrial motions. Three of those assignments raise facial challenges to the constitutionality of Oregon's death-penalty statute. This court previously has considered and rejected defendant's constitutional challenges to that statute. We discuss defendant's remaining assignments of error regarding his pretrial motions below.

### A. *Evidence Regarding Crimes Against Dalton*

Defendant maintains that the trial court erred in overruling defendant's objections to photographs that the state introduced depicting evidence of his crimes against Dalton.

---

[2] In a death-penalty sentencing proceeding, ORS 163.150(1)(b) requires that a jury unanimously answer the following four questions in the affirmative before the court can impose a death sentence:

"(A) Whether the conduct of the defendant that cased the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

Before trial, the parties and the court discussed a series of photographs that the state sought to admit relating to defendant's assault of Dalton. Those photographs consisted of images of injuries to Dalton's face, head, hand, and legs, all taken prior to Dalton receiving medical treatment. Defendant argued that the photographs "that depict the actual scarring, the injuring, the bruising and so forth but don't depict the blood and gore will certainly serve the purposes of the State in relaying to the jury what took place on that day." Defendant argued further that "[a]nything else is prejudicial and is not relevant to any value [and] it's not probative of any issue in this case."

■ In response, the state argued that the photographs were relevant because they gave a complete picture of the events that had led to the victim's murder and because they placed defendant in an area that was relevant to the victim's death, both in location and in time. Ultimately, the court sustained defendant's objections to four of the photographs, but allowed the state to introduce the balance of the photographs. The court concluded that the photographs were relevant:

"It is relevant in my opinion because we're talking about the same black-powder revolver. My understanding of the evidence is the black-powder revolver belonged to Ms. Dalton on the same date, being December 29, 2001[,] in the same area of Curry County where [the victim] was killed. Since it's the same date and it's the weapon, the alleged murder weapon in the particular case, I think the State is allowed to show where that weapon came from.

"Also it shows the intent of [defendant] in his activities regarding [the victim]. I believe testimony would be relevant as to the demeanor [defendant] showed at the time; the violence he showed towards Ms. Dalton at that time would be both relevant in the manner in which he interacted with [the victim] a short period of time later on the same day.

"Obviously they are similarly situated since both were in their own homes. They let a person into their own home who they were previously aware of—at least knew the individual. In the case of Ms. Dalton, knew very well. And during the course of the further contact between [defendant] in

their own homes Ms. Dalton was severely beaten and [the victim] ended up being killed."

Defendant argues that the "unfairly prejudicial effect of the photographs substantially outweighed their minimal probative value, and therefore the court should have excluded them [under OEC 403]." "In the context of OEC 403, 'unfair prejudice' means 'an undue tendency to suggest decisions on an improper basis, commonly although not always an emotional one.'" *State v. Moore*, 324 Or 396, 407-08, 927 P2d 1073 (1996) (quoting Legislative Commentary, cited in Laird C. Kirkpatrick, *Oregon Evidence*, 125 (2d ed 1989)). We review trial court decisions under OEC 403 for an abuse of discretion. *Id.* at 407.

In order to prevail, defendant must show that admission of the photographs was *"unfairly* prejudicial." *Id.* (emphasis in original). Defendant has not suggested that the photographs in this case created a danger of undue prejudice other than to evoke a person's natural revulsion regarding the beating Dalton endured. This court previously has stated that relevant photographs are not unfairly prejudicial simply because they are graphic. *See State v. Barone*, 328 Or 68, 88, 969 P2d 1013 (1998), *cert den*, 528 US 1135 (2000) ("Although the photographs in question were graphic, they could not be said to be remarkable in the context of a murder trial."). Consequently, we conclude that the trial court did not abuse its discretion in admitting the photographs of Dalton's injuries.

B. *Requirement that Defendant Wear a Stun Belt During Trial*

Defendant argues that the trial court erred in requiring him to wear a "stun belt" during the trial, without first holding a hearing and finding that such control was necessary to prevent defendant from disrupting the proceedings. Defendant concedes that he did not object to wearing the stun belt or request findings to support that form of restraint. Nevertheless, defendant argues that the trial court erred by "deciding the question *sua sponte*." As a result, defendant contends that this court should review his claim as "plain error."

■ Plain error requires that (1) the error be one of law; (2) the legal point be obvious, that is, not reasonably in dispute; and (3) to reach the error, "[w]e need not go outside the record or choose between competing inferences to find it[.]" *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). If the asserted error satisfies those criteria, this court may then exercise its discretion to correct the error. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991). As this court articulated in *Ailes*:

> "A court's decision to recognize unpreserved or unraised error in this manner should be made with utmost caution. Such an action is contrary to the strong policies requiring preservation and raising of error. It also undercuts the established manner in which an appellate court ordinarily considers an issue, *i.e.*, through competing arguments of adversary parties with an opportunity to submit both written and oral arguments to the court. Moreover, by *expressly* following the prescribed method of recognizing unpreserved or unraised error, much greater efficiency in the review process between appellate courts is facilitated by giving this court the benefit of the recognizing court's reasoning."

*Id.* (emphasis in original).

According to defendant, this court should review the alleged error as plain error because (1) he was entitled to a hearing on the use of the restraint, but did not receive one; (2) the trial court never made the findings required to justify the use of the stun belt; and (3) "this court need not go outside the record to determine that the use of the device was prejudicial to defendant's ability to participate in his own defense." Defendant also contends that the court should exercise its discretion to correct the issue because the "gravity of the error is extreme." Defendant argues that the stun belt deprived him of the ability to participate fully in his defense.

■■ This court long has recognized the right of a criminal defendant to appear free of physical restraints during a jury trial. *See State v. Smith*, 11 Or 205, 8 P 343 (1883) (recognizing principle). In *State v. Long*, 195 Or 81, 244 P2d 1033 (1952), this court provided the rationale for that right, explaining "that such restraint upon a prisoner 'inevitably tends to confuse and embarrass his mental faculties[ ] and

thereby materially to abridge and prejudicially affect his constitutional rights of defense.'" *Id.* at 91 (internal citations omitted). Defendant argues that requiring a person to wear a stun belt is no different than requiring a person to wear shackles. We do not agree.

The rationale used in *Long* is not applicable in this case. There is no evidence in the record that the stun belt that defendant wore at trial was visible to the jury, and, therefore, defendant cannot claim that the jury was biased by its presence. Furthermore, defendant failed to provide evidence or point to anything in the record indicating that the stun belt affected his ability to assist in his defense. Because defendant is unable to satisfy the third element of the plain error criteria, this court will not consider defendant's unpreserved claim of error.

## C. *Motions Regarding Count One*

Defendant next takes issue with the trial court's denial of his motion to dismiss and motion for judgment of acquittal on count one of his indictment. That count alleged aggravated murder based on murder during the course of a burglary. Prior to trial, defendant asserted that count one failed to allege the necessary elements of burglary. In this court, defendant similarly argues that

> "the indictment on Count 1 in this case failed to allege sufficient facts to constitute the offense of Aggravated Murder, and it failed to allege facts sufficient to inform defendant of the nature of the underlying burglary that the state intended to prove, so that he would be able to prepare a defense."

Defendant argues that, under ORS 163.095(2)(d), the state was required to allege that the defendant actually committed a crime listed in ORS 163.115(1)(b) to prove the allegations in count one. Defendant further notes that in *State v. Sanders*, 280 Or 685, 688-90, 572 P2d 1307 (1977), this court held that an indictment alleging burglary must specify the crime that the accused is alleged to have intended to commit at the time that he or she entered or remained unlawfully. Defendant argues that, to properly allege aggravated felony murder based on the underlying crime of burglary, the state must allege each of the elements of burglary.

Without such allegations on the state's part, defendant contends that he could not know whether the state planned to prove that he intended to commit assault, murder, or theft.

■■ This court consistently has held that "an indictment generally is sufficient if it charges an offense in the words of the statute." *State v. Hale*, 335 Or 612, 621, 75 P3d 612 (2003). *See also State v. Rogers*, 313 Or 356, 380, 836 P2d 1308 (1992) (sex abuse charge was sufficiently definite and certain without specifying the state's theory of the crime or elements of sexual abuse); *State v. Montez*, 309 Or 564, 597, 789 P2d 1352 (1990), *cert den*, 520 US 1233 (1997) (finding that "[a]n indictment in the language of the statute generally is sufficient"). *Hale, Rogers*, and *Montez* demonstrate that, when alleging aggravated felony murder, it is unnecessary to set forth the elements of the underlying felonies. In this case, because the state's indictment tracks the language of ORS 163.095(2)(d) and ORS 163.115(1)(b)(C), the trial court correctly denied the defendant's motion to dismiss and motion for judgment of acquittal on count one.[3]

### III. GUILT-PHASE ASSIGNMENTS OF ERROR

Defendant presents eight assignments of error that pertain to the guilt phase of his trial. Two of those assignments pertain to defendant's requested jury instructions on the elements of burglary and the elements of robbery. Defendant's arguments regarding those assignments are not well taken, and an extended discussion would not benefit the public, bench, or bar. Therefore, we decline to address them further. We address defendant's remaining guilt-phase assignments of error below.

### A. *Testimony of Defendant's Forensic Expert*

Defendant claims that the trial court erred in restricting the testimony of defendant's expert witness regarding whether the bullet that entered the victim's body would have inflicted a fatal injury if it had not deflected off the victim's rib. Defendant's theory of the case was that he did not shoot the victim intentionally and, therefore, at most

---

[3] We note that nothing in the record before us suggests that the discovery the state provided to defendant did not fully inform defendant of the state's factual and legal theories underlying the aggravated murder charges.

had committed the lesser-included offense of manslaughter. Defendant testified that he had reached over and grabbed the pistol from the table and was bringing it up to shoot himself when the victim grabbed it in an attempt to stop him and the pistol discharged.

At trial, the state's medical examiner testified that the bullet that killed the victim had entered above his left breast, traveled downward through the tissue under his skin, and struck his left sixth rib, which deflected it to the right and through the victim's heart and liver. The state's forensic expert testified, however, that the victim had been shot at a distance of more than five feet because the clothing that the victim wore at the time of the shooting did not contain any gunshot residue.

Defendant's forensic expert, Sweeney, a criminalist who specialized in firearms-related evidence and crime scene reconstruction, could not form an opinion on the actual proximity between the muzzle of the pistol and the victim's body. When asked whether the type of wound inflicted by the trajectory of the bullet could have occurred with both men standing up and one shooting straight across at the other, Sweeney responded, "No." According to Sweeney, it was critical for the jury to understand that the angle from which the pistol had been fired would change relative to the position that the victim's body had been in when he was shot. For example, Sweeney claimed that, if the victim had been standing upright, then the pistol would have had to have been fired directly overhead, pointing down; but, if the victim had been bent over at the waist, then the pistol would have had to have been fired at an angle out in front of the victim that would have allowed for the established trajectory of the bullet. Neither party disputed that the victim's body was discovered face-down on the floor of his kitchen and that the position of the victim's body when shot was unknown.

In the context of that testimony, defense counsel asked Sweeney: "Now, if that—the way the angle that we're looking at, if there had been no deflection, would this particular shot have been a fatality in your opinion?" The state objected to that question without stating any ground, and the trial court sustained the objection. Defendant rephrased the

question as, "If there is no deflection, where would that—where would you anticipate that bullet to go through?" Again, the trial court sustained the state's objection, stating that the question was "getting into high speculation." Defendant argued that "we're talking about a trajectory going straight down and what I'm trying to get at is where, if there was no deflection, where would it have gone in the body?" The court ruled that the question was not relevant and added, "Okay. But to any possible charges with [a lesser-included offense] that question's still not even relevant."

As indicated above, the state's contention was that defendant killed the victim intentionally. Defendant argues that whether the angle at which the weapon was fired was likely to cause death was relevant to defendant's state of mind. Therefore, defendant contends, the trial court erred in sustaining the state's objection to defendant's question to Sweeney. Further, defendant argues that the trial court's statement that the issue was not relevant to whether defendant was guilty of a lesser-included offense was an impermissible comment on the evidence under ORCP 59 E.[4] Defendant claims that the trial court's statement "effectively directed the jury that it could not consider whether defendant had a reasonable expectation that firing the weapon at such an acute angle would cause death." The consequence of the trial court's statement, defendant argues, was that it deprived him of his defense, because it precluded the jury from considering his theory of the case.

The state contends that defendant's claim is unpreserved because, after the trial court ruled on the objection, defendant failed to make an offer of proof as to what Sweeney's testimony would have been. The state points out that, at trial, defendant provided no argument concerning how Sweeney's opinion would be relevant to defendant's intent. Likewise, the state argues that defendant never objected to the trial court's ruling on the grounds that it violated ORCP 59 E. Accordingly, the state argues that we should decline to consider defendant's arguments for the first

---

[4] ORCP 59 E applies in criminal cases, ORS 136.330(1), and provides that "[t]he judge shall not instruct with respect to matters of fact, nor comment thereon."

time on review. Defendant responds that, because the substance of Sweeney's proffered testimony was apparent from the context of his direct examination, an offer of proof following the trial court's ruling was not required under OEC 103(1)(b).[5]

To assure that appellate courts are able to determine whether a trial court erred in excluding evidence and whether that error was likely to have affected the trial's result, an offer of proof ordinarily is required to preserve error when a trial court excludes testimony. *See State v. Affeld*, 307 Or 125, 128, 764 P2d 220 (1988) (overruling line of cases holding that offer of proof was not required on cross-examination). In *Affeld*, this court stated:

> "Article VII (Amended), section 3, of the Oregon Constitution requires this court to affirm judgments of lower courts if, in the opinion of this court, the judgment achieved the correct result, even if error was committed. That constitutional provision makes it incumbent on lower courts and the parties appearing in lower courts to ensure that the record reviewed by this court is adequate for this court to make a reasoned decision. A record can be adequate in situations in which the scope of testimony is restricted by the trial court only if an offer of proof is made. * * *

> "The only situations in which an offer of proof is not required are those situations in which an offer of proof is impossible because of a trial court's refusal to allow the offer of proof to be made."

307 Or at 128-29.

Following the trial court ruling at issue here, defendant made no attempt to inform the trial court of the purported relevance of Sweeney's opinion. Defendant asserts for the first time on review that Sweeney's testimony about

---

[5] OEC 103 provides, in part:

"(1) Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:

"* * * * *

"(b) In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

whether the nondeflected trajectory of the bullet would have been fatal is relevant to the issue of intent.[6] Without an offer of proof to that effect, however, defendant failed to make an adequate record for this court to review. *See State v. Smith*, 319 Or 37, 43-44, 872 P2d 966 (1994) (in death-penalty case, absence of offer of proof precluded court from considering whether expert witness's testimony concerning length of time defendant likely would spend in state hospital if found guilty except for insanity was erroneously excluded and, if so, whether that exclusion was harmful). Likewise, defendant never argued at trial that the trial court's statement was an impermissible comment on the evidence under ORCP 59 E; defendant raises that claim for the first time on review. Furthermore, our scrutiny of the record does not support defendant's contention that the relevance of the desired testimony was apparent from the context of Sweeney's direct examination.

Consequently, we are unable to determine whether the trial court erred in restricting Sweeney's testimony and, if so, whether that alleged error affected the result in this case. Accordingly, we conclude that defendant failed to adequately preserve that issue for this court's review. *See State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) (preservation of error requires party to provide trial court with explanation specific enough to allow court to identify alleged error and correct it if warranted).

B. *Cross-Examination Regarding Defendant's Previous Felony Convictions*

Three of defendant's assignments of error involve the prosecutor's cross-examination of defendant regarding his prior felony convictions.

At the conclusion of defendant's direct testimony during the guilt phase of the proceeding, defense counsel questioned defendant about his prior felony convictions. Defendant acknowledged that he had been convicted of unauthorized use of a vehicle in California, attempted arson in

---

[6] We assume that defendant anticipated that Sweeney would testify that the resulting trajectory of the bullet had it not deflected off the victim's rib, would have inflicted a nonfatal injury.

Nevada, and accessory to murder after the fact in Nevada. Defendant could not recall if he also had been convicted of being a felon in possession of a firearm. At the end of that exchange, defendant stated: "I'm also—I also * * *," but defense counsel stopped him with the word, "No." The prosecutor's first question of defendant on cross-examination was, "[W]hat other felonies have you been convicted of?" Defendant replied, "I've also been convicted of a Manslaughter charge in 1981." Defense counsel then asked to be heard outside the presence of the jury. The court replied:

> "No. You can make a motion at the appropriate time afterwards. Your motion will be credited.
>
> "But the question that was asked was legitimate. The answer that was given I will instruct the jury to disregard because it exceeds the fifteen year period. But there was nothing in the question that would have led him to give that answer."

The court next instructed the jury:

> "Members of the jury, convictions can be used solely for the purpose of testing someone's credibility. The law says that one may only be asked questions on convictions that have occurred within the last fifteen years.[7] So you are to disregard any convictions or any answers that reflect a conviction that occurred prior to fifteen years from this date * * *."

Defense counsel did not except to that instruction or ask for a supplemental instruction. The prosecutor resumed cross-examination of defendant but was interrupted by defense counsel who stated, "Excuse me, Your Honor. Before we—I've got a procedural matter." The trial court then held a bench conference during which defendant apparently moved for a mistrial. That conference, however, was unrecorded. The trial court allowed cross-examination to continue and, following a brief redirect, heard defendant's motion for mistrial outside the presence of the jury.

---

[7] OEC 609(3)(a) provides that evidence of a conviction for purposes of impeachment is not admissible if "[a] period of more than 15 years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date[.]"

During that hearing, the trial court asked the prosecutor if he was aware of another felony conviction during the permissible 15-year period. The prosecutor responded that he was trying to elicit a felony conviction in 1998 in California for receiving stolen property based on his reading of a certified copy of conviction. The prosecutor's reading of the certified copy of conviction, however, was incorrect. The prosecutor brought his misunderstanding to the trial court's attention after the following exchange:

"THE COURT: Okay. So if there is actually another felony within the fifteen-year period then [the prosecutor] would not be unethical or inappropriate in asking the question, 'Do you have any other felonies?'

"[PROSECUTOR]: That's my understanding, Your Honor.

"THE COURT: So that's why the Motion for Mistrial was denied and that's why I didn't send the jury out. I assumed he would not be asking that unless there was another felony in there.

"[DEFENSE COUNSEL]: Your Honor, if I may comment. I believe that the other felony is in connection with this one, the Manslaughter, is it not?

"[PROSECUTOR]: It is, Your Honor.

"THE COURT: It could be in connection with it, but it's not one that's listed and he would be able to list that.

"[DEFENSE COUNSEL]: Your Honor, I'd want to make a little record here if I may.

"THE COURT: Sure.

"[DEFENSE COUNSEL]: And I have some concerns. And the reason I have some concerns is timing. And [the prosecutor] has—knows fairly well that my client is spontaneous in response. And * * *

"THE COURT: (Interposing) We've noticed that.

"[DEFENSE COUNSEL]: Yes. And I am walking back to my table when he asked that statement. He knows darn good and well that the Manslaughter is not admissible. He makes that statement while I'm doing something else.

"And, you know, the whole thing—it was set up. It—to me, it just—I have grave concerns about the way the process went and I think that [the prosecutor] knew full well that that was not admissible. He used it at a time when I was distracted so I could not step in and he knew exactly what the purpose was and it was to impeach him on a crime that was not an impeachable crime.

"THE COURT: Okay. But the question he asked is a legitimate question as long as there [were] other felonies not elicited in direct examination. He's not required to ask 'in the last fifteen years.' It might be a better question but then there might be a complaint that he's insinuating to the jury that there are other felonies beyond the 15-year period.

"So the question was appropriate. He had a basis for the question and unfortunately [defendant] didn't give one of the theft cases, he gave a 1980 one. And the jury has been so cautioned. Obviously it is always difficult to unring the bell but the motion has been made. The motion has been denied."

Following that discussion, the prosecutor stated:

"[PROSECUTOR]: Your Honor, in regard to that motion I have to indicate to the Court that in the certified copy of conviction that I'm looking at, I represented to the Court a moment ago that Defendant was convicted of Receipt of Stolen Property.

"Your Honor, at the time that I asked the question that was my impression. As the Court was questioning me I looked at the front page of this conviction and I come to find that the Defendant pled guilty and was sentenced only on Count I of that indictment. I was in error, Your Honor. I thought he was convicted of Count II as well and in looking at the information I noticed that the other two are misdemeanors.

"As I'm asking the question I'm looking at Count II, I see a felony; I ask the question. For that I apologize and I did not mean to misrepresent to the Court * * *

"THE COURT: (Interposing) So to make sure the record is absolutely clear then, is there no other felony within the fifteen years?

"[PROSECUTOR]: That seems to be the case, Your Honor. I don't have another felony within the fifteen years.

It's the Unauthorized Use of a Motor Vehicle; that's my mistake. I asked for other felonies. It was my impression that he'd been convicted of Receiving Stolen Property as well and in looking at the front page of the document it appears he pled guilty only to Count I, Unauthorized Use.

"* * * * *

"[PROSECUTOR]: My intention, Your Honor, was not to elicit an answer on the Manslaughter.

"THE COURT: I know that.

"[PROSECUTOR]: I'm aware of that and we've discussed that with counsel and I might represent I don't know that the Defendant is spontaneous or not. I've seen him on the videotapes. I've never seen him testify. I had no idea whether he was spontaneous or not. The fact remains, Your Honor, the question was asked; the Defendant answered it. That's not the answer I expected. And so * * *

"[DEFENSE COUNSEL]: And based on his statements of—and the search of the records which I appreciate, I would again move for mistrial.

"THE COURT: Your motion is stronger but for the reasons previously stated the motion is still going to be denied.

"[DEFENSE COUNSEL]: Thank you and I would accept your ruling.

"THE COURT: Okay. I believe the instruction that I gave the jury hopefully will resolve the problem."

In instructing the jury at the end of the case, the trial court explained that prior convictions may be used only for purposes of impeachment and not as evidence of propensity:

"Now, if you find that a witness has been convicted of a crime you may consider this testimony only for its bearing, if any, on the believability of that witness's testimony.

"Likewise, if you find that [defendant] has been previously convicted of a crime you may consider this conviction only for its bearing, if any, on the believability of [defendant's] testimony. Specifically, you may not use this evidence for the purpose of drawing the inference that because [defendant] was convicted of a previous crime, [defendant] may be guilty of the crimes charged in this particular case."

In three assignments of error, defendant claims that the trial court erred by (1) denying defendant's immediate request to be heard outside the presence of the jury on his objection to the state's question; (2) giving a curative instruction without first allowing defendant to object to that instruction; and (3) denying defendant's subsequent motion for a mistrial. Defendant makes the following combined argument in support of those three assignments of error.

Defendant argues that the prosecutor's question prejudiced defendant's right to an impartial jury under Article I, section 11, of the Oregon Constitution as well as the Sixth Amendment to the United States Constitution, and deprived defendant of his fundamental right to a fair trial. Defendant contends that the result of the prosecutor's question—*i.e.*, disclosing to the jury that defendant had committed a prior manslaughter—was extremely prejudicial. Defendant also argues that no instruction could cure the overwhelming probability that the jury would use the knowledge of that conviction as evidence of defendant's propensity to kill. Moreover, defendant maintains that the trial court's instruction to the jury that the manslaughter conviction was not admissible because it was more than 15 years old did not mitigate that prejudice but, rather, added to it because "[i]t effectively told the jury that the reason that the evidence was not allowed was one of those proverbial 'technicalities' that is just the sort of thing that infuriates the lay public against defense attorneys and those whom they represent." Consequently, defendant concludes, the trial court abused its discretion in denying defendant's motion for a mistrial.

The state contends that defendant's claims of error are unpreserved and factually incorrect. First, the state argues that defendant did not object to the prosecutor's question but, rather, asked to be heard outside the jury's presence, an action that the court interpreted as a motion for a mistrial. Because defendant did not object to either the prosecutor's question or the trial court's contemporaneous refusal of his request to be heard, the state argues that defendant's claim is unpreserved. Morever, the state contends that any error was harmless because the trial court ultimately credited defendant's motion for a mistrial as timely and fully considered the grounds put forth to support the motion.

Likewise, the state contends that defendant's claim of error regarding the trial court's curative instruction is also unpreserved. Relying on ORCP 59 H,[8] the state argues that defendant made no exception to the instruction and did not argue in his motion for a mistrial that irreversible prejudice resulted from the prosecutor's question or, that the instruction itself was prejudicial. Therefore, the state concludes, this court should decline to consider that unpreserved claim of error.

Finally, the state argues that the trial court did not abuse its discretion in denying defendant's motion for a mistrial. The state asserts that the trial court was in the best position to assess any potential prejudice and to rectify it. Consequently, the state contends, the trial court's determination that a curative instruction would be sufficient to mitigate any prejudice and that declaring a mistrial was unnecessary, was within the trial court's sound discretion. The state also points out that defendant has not demonstrated that the jury failed to follow the court's instruction.

In answer to the first of defendant's assignments of error here, our review of the record supports the state's position that defendant did not, in fact, object to the prosecutor's question. Instead, defendant requested to be heard on a motion for a mistrial outside the presence of the jury. Although the court denied that request when made, it credited the request as timely and heard defendant on the merits of the motion at the close of cross-examination and a brief redirect examination. Hence, the premise of defendant's assignment of error (that the trial court did not allow him to object to the state's question) is not supported by the record.

In his second assignment of error here, defendant claims that the trial court did not allow him to object to the curative instruction regarding his previous manslaughter conviction. Our review of the record, however, reveals that defendant made no effort to object or take exception to that

---

[8] ORCP 59 H (2003), made applicable to criminal cases by ORS 136.330(1), provided, in part:

"[N]o instruction given to a jury shall be subject to review upon appeal unless its error, if any, was pointed out to the judge who gave it and unless a notation of an exception is made immediately after the court instructs the jury."

instruction and did not request that the court give a supplemental instruction. Consequently, defendant's claim that the trial court did not allow him to object is not supported by the record. Moreover, under ORCP 59 H, a failure to except to the trial court's instruction on a specific theory generally bars appellate relief on that theory, because the error is not adequately preserved. *Delaney v. Taco Time Int'l.*, 297 Or 10, 18, 681 P2d 114 (1984); *see also Wyatt*, 331 Or at 343 (to preserve issue for appellate consideration, party must object with sufficient clarity to allow trial court to consider alleged error). Likewise, a party's failure to request a proper instruction precludes appellate relief for the trial court's refusal to give the instruction. *Brown*, 310 Or at 355. Because defendant did not object or take exception to the instruction immediately after it was given and did not request a supplemental instruction, ORCP 59 H and this court's preservation jurisprudence preclude review of any claim of error respecting the trial court's curative instruction.

██ ██ Defendant's final assignment of error here contends that the trial court erred in denying defendant's motion for a mistrial. Whether to grant a mistrial is a determination committed to the "sound discretion of the trial court," *Rogers*, 313 Or at 381, because the trial judge is in the best position "to assess and to rectify the potential prejudice to the defendant," *State v. Farrar*, 309 Or 132, 164, 786 P2d 161 (1990). Thus, we review whether a mistrial should have been granted for abuse of discretion. *State v. Smith*, 310 Or 1, 24, 791 P2d 836 (1990); *see also State v. Wright*, 323 Or 8, 19, 913 P2d 321 (1996) ("[T]he trial court's choice not to declare a mistrial but, instead, to give a cautionary instruction, falls within the permissible range of choices committed to the court's discretion."). Even if we find a prosecutor's conduct to be improper, we will not find an abuse of discretion unless the effect of that conduct is to deny a defendant a fair trial. *Wright*, 323 Or at 19; *State v. Hoffman*, 236 Or 98, 108, 385 P2d 741 (1963). That is so because the "presumably harmful effect" of prosecutorial misconduct may be obviated by a proper instruction. *State v. Wederski*, 230 Or 57, 60, 368 P2d 393 (1962). Therefore, the dispositive question on this issue is "whether the purportedly curative instruction was sufficient to unring the bell." *State v. White*, 303 Or 333, 342, 736 P2d

552 (1987); *see also State v. Jones*, 279 Or 55, 62, 566 P2d 867 (1977) ("There may, however, be cases in which the testimony which the jury is instructed to 'disregard' is so prejudicial that, as a practical matter, 'the bell once rung, cannot be unrung' by such an admonishment.").

In *Jones*, the state charged the defendant with rape. At trial, the prosecutor persisted in insinuating to the jury that the defendant had committed rapes many times before, although the prosecutor knew that there was no proof of any prior conviction for rape. As one improper tactic, the prosecutor called a police officer who testified that another witness had stated in the officer's presence that the defendant "had done it so many times before." *Jones*, 279 Or at 61-62. After the defendant objected, the trial court instructed the jury " 'to disregard the statement made by the last witness [the officer]. You are directed to erase it from your mind and pay no attention to it.' " *Id.* at 62. Subsequently, the trial court denied the defendant's motion for a mistrial. On review, this court concluded that that cautionary instruction was insufficient to unring the bell:

> "This prosecuting attorney, well knowing that he had no proof that defendant has been previously convicted of rape (as indicated by the record of various other offenses offered by him in evidence), persisted in making comments and insinuations to that effect, including the clearly improper attempt to get before the jury the alleged statement by [the prosecution witness] that he had 'done it so many times before.'
>
> "In a prosecution for rape in which, as in this case, the jury must decide between the credibility of the prosecuting witness and the defendant, the prejudice resulting from the admission of such evidence was so pervasive as to lead us to the conclusion that, as a result, defendant was denied a fair trial."

*Jones*, 279 Or at 63. Accordingly, this court reversed and remanded for a new trial.

In *White*, the prosecutor remarked in opening statement that the defendant had refused to testify in his codefendant's trial. Immediately thereafter, defense counsel moved for a mistrial. The trial court concluded that the remark was

inappropriate but denied the motion on grounds that, at that stage of the proceeding, "an indication to the jury that whether or not [the defendant] chose to testify in a prior proceeding [was] not relevant[.]" *White*, 303 Or at 337. The trial court then instructed the jury that the defendant's refusal to testify was "not relevant" and not "probative of the evidence in this case." *Id.* at 338. On review, however, this court reached a contrary conclusion.

In light of established state and federal constitutional precedents prohibiting the prosecution from drawing the jury's attention to the defendant's exercise of the right to remain silent, this court determined that the prosecutor was well aware of that precedent and "deliberately chose to offend the rules." *Id.* at 340-41. Given the prosecutor's deliberate injection of evidence regarding the defendant's exercise of his constitutional right to remain silent, this court ruled that the admission of such evidence is " 'usually reversible error * * * if it is done in a context whereupon inferences prejudicial to the defendant are likely to be drawn by the jury.' " *Id.* at 341-42 (quoting *State v. Smallwood*, 277 Or 503, 505-06, 561 P2d 600 (1977)). In view of the "presumably harmful effect" of such prosecutorial misconduct, this court concluded that the trial judge had been required to do something more than simply instruct the jury that defendant's refusal to testify in his codefendant's trial was irrelevant. *Id.* at 343-44. In *White*, this court noted that "the misconduct * * * was at least as serious as that involved in [*Jones*], and that the purportedly curative instruction here was not even as strong as that given in *Jones*." 303 Or at 344. As a result, this court held that the defendant was entitled to a new trial. *Id.*

██ ██ Here, as stated above, immediately following the prosecutor's objectionable question, the trial court gave a curative instruction to the jury to disregard any convictions that were not within the permissible 15-year period. That instruction was significantly stronger than the statement given in *White*; by contrast, it included an explanation of the sole purpose for admitting prior convictions and the reason why the reference to defendant's manslaughter conviction was to be disregarded. Additionally, the trial court expressly instructed the jury that defendant's prior convictions could not be used as evidence of his propensity to commit the

crimes charged in the present case. "[J]urors are assumed to have followed their instructions, absent an overwhelming probability that they would be unable to do so." *Smith*, 310 Or at 26. Moreover, on the facts of this record, it is difficult to say that the prosecutor's behavior, though careless, was a deliberate attempt to admit improper evidence.

Finally, the admissibility principle that the prosecutor's actions offended here involved an evidentiary rule and not a constitutional right, as in *White*. Thus, the "presumably harmful effect" of the prosecutor's conduct in this case was not of such magnitude that we can conclude that a proper curative instruction could not ameliorate any potential prejudice.

In view of the foregoing, as well as this court's deference to the trial court's assessment of the need for a mistrial, *Wright*, 323 Or at 12, we conclude that the trial court's cautionary instructions to the jury were sufficient to protect against prejudice to defendant and, therefore, its denial of defendant's motion for a mistrial was not an abuse of discretion. *See State v. Terry*, 333 Or 163, 177, 37 P3d 157 (2001) (finding curative instruction sufficient to "neutralize the possibility of prejudice to the defendant" where witness's statement contained inference that defendant failed polygraph examination); *Montez*, 309 Or at 596 (concluding that mistrial not warranted on grounds of prosecutorial misconduct where prosecutor's question was not intended to elicit inadmissible testimony about defendant's prior criminal conduct).

C. *Jury Instructions Regarding Lesser-Included Offenses*

Defendant next claims that the trial court erred in denying his requests that (1) the jury be instructed that manslaughter is a lesser-included offense of aggravated murder; and (2) the verdict form include the lesser-included offenses of murder and manslaughter as alternatives to both counts of aggravated murder.

In proposing jury instructions to the trial court, defendant requested that the jury be instructed on first-degree manslaughter as a lesser-included offense to both charges of aggravated murder (counts one and two) and the

charge of intentional murder (count three). Based on defendant's testimony that he did not intentionally kill the victim, the trial court agreed to give the first-degree manslaughter instruction as a lesser-included offense of the intentional murder charge. On defendant's request that the instruction also be given with respect to both counts of aggravated murder, the trial court concluded:

> "You have requested the lesser included offense of Manslaughter in the First Degree both to the Aggravated Murder charges and to the Murder charge[ ]. If the jury was to find—not to find beyond a reasonable doubt that a burglary or a robbery occurred, then obviously they have to bounce down to the Murder charge. And then if they don't find an intentional killing, then they can go to the lesser included offense of Manslaughter in the First Degree.

> "If they were to find that he did not intentionally kill [the victim] in the aggravated, then they would really be bouncing all the way down to the reckless conduct for Manslaughter. However, with the way the instructions are set up they would still be required to go through the charges that we presently have in the indictment and they can go in any order, obviously, but if they find him not guilty of intentionally causing the death in the Aggravated Murder then obviously in the next charge, Count III, they would find him not guilty of the Murder.

> "So I don't see any reason to give a lesser included in both of those. I think it would be extremely confusing to the jury. Because they're going to get—if they do that scenario, they're going to get to the lesser included Manslaughter in the First Degree.

> "* * * * *

> "Because they still have to render a verdict on Intentional Murder."

At that point, defendant's counsel indicated that the trial court's sequence of instructions could generate "potential confusion," but did not articulate how that confusion would occur. In response, the trial court explained its approach again:

> "[W]hat I've set it up as Aggravated Murder will be decided by the jury.

"\* \* \* \* \*

"If they find him not guilty of Aggravated Murder then they have to go to the Murder charge because it is one of the counts in the indictment. They can't—unless there's a hung jury, they can't fail to vote on the Murder charge. So they have to vote on the Murder charge. So I have the Manslaughter in the First Degree as a lesser included of the Intentional Murder, not of the Aggravated Murder.

"Because they have to get—if they stop somewhere along the line, they do not get to the lesser included. If they don't stop at Aggravated Murder or Murder then they have to deliberate on the Manslaughter in the First Degree."

After a recess, defendant objected to the proposed verdict form on the ground that it did not indicate that intentional murder and first-degree manslaughter were lesser-included offenses of aggravated murder. Defense counsel stated that defendant's position was that "the verdict form in its form does not give the jury an impression that they have an alternative to Aggravated Murder either under Counts I or II; that they must either vote guilty or not guilty[.]" Referring to its previous decision concerning the jury instructions, described above, the trial court reiterated that it would give first-degree manslaughter as a lesser-included offense of the murder charge. The court indicated that, in charging the jury, it would explain that the jury would deliberate on the lesser-included offense only if the jury found defendant not guilty of the charged offenses of aggravated murder and intentional murder. Defendant excepted to that ruling. Neither defendant nor the state requested lesser-included instructions on felony murder or the crimes of first-degree burglary or first-degree robbery.

The trial court's instructions included the following statement: "[R]emember the instructions should always be taken as a whole. Don't concentrate on any particular instruction." After instructing the jury on the elements of aggravated murder and murder, the trial court, in relation to the first-degree manslaughter instruction, informed the jury, "Now, when you deliberate you should first consider the charged offense of Murder. Only if you find the Defendant not guilty of the charged offense may you consider the lesser included offense of Manslaughter in the First Degree."

Defendant argues that he was entitled to instructions on intentional murder and first-degree manslaughter as lesser-included offenses to the aggravated murder charges. Defendant reasons that, because intentional murder is necessarily a lesser-included offense to aggravated murder, and because manslaughter is a lesser-included offense to intentional murder, manslaughter is also a lesser-included offense to aggravated murder. Defendant contends that, because the evidence justified a manslaughter instruction, the trial court's refusal to include lesser-included offenses to each aggravated murder count violated his rights under ORS 136.460[9] and ORS 136.465[10] and his rights under the United States Constitution.[11] Although the trial court instructed the jury on first-degree manslaughter as a lesser-included offense to the murder charge, defendant submits that that procedure "did not alleviate the harm" from the trial court's failure to so instruct on the aggravated murder counts. Defendant alleges the following types of harm: (1) the jury might have found that defendant committed a robbery and a burglary, but did not cause the victim's death

[9] ORS 136.460 provides, in part:

"(1) Upon a charge for a crime consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the accusatory instrument and guilty of any degree inferior thereto or of an attempt to commit the crime or any such inferior degree thereof.

"(2) The jury shall first consider the charged offense. Only if the jury finds the defendant not guilty of the charged offense may the jury consider a lesser included offense. If there is more than one lesser included offense, the jury shall consider the lesser included offenses in order of seriousness. The jury may consider a less serious lesser included offense only after finding the defendant not guilty of any more serious lesser included offenses."

[10] ORS 136.465 provides:

"In all cases, the defendant may be found guilty of any crime the commission of which is necessarily included in that with which the defendant is charged in the accusatory instrument or of an attempt to commit such crime."

[11] Defendant cites the due process clauses of the Fifth and Fourteenth Amendments and the accused's right to trial by an impartial jury guaranteed by the Sixth Amendment. Defendant asserts,

"The United States Supreme Court has held that those provisions 'require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' *United States v. Gaudin,* 515 US 506, 510, 115 S Ct 2310, 132 L Ed 2d 444 (1995) (citing *Sullivan v. Louisiana,* 508 US 275, 277-78, 113 S Ct 2078, 124 L Ed 2d 182 (1993)[ ]; footnote omitted)."

intentionally, and yet nevertheless convict him of aggravated murder rather than leave him unaccountable for the robbery and burglary; and (2) "the jury was not told that it could find defendant guilty of manslaughter under each or any of the counts[.]" Defendant contends that the evidence in this case could have supported a "number of different possible combinations of guilt on the principal charges and lesser-included offenses." Therefore, defendant concludes, "[b]ecause many of the various lawful ways of resolving the conflicts in the evidence were foreclosed by the instructions as given, the denial of the requested instructions was not harmless." Correspondingly, defendant asserts that the trial court erred in refusing to include intentional murder and first-degree manslaughter on the verdict form as lesser-included offenses of each aggravated murder count.

The state argues that defendant's arguments fail for several reasons: (1) the trial court did, in fact, instruct the jury on both murder and the lesser-included offense of first-degree manslaughter in relation to the intentional murder count; (2) the court properly considered intentional murder as the functional equivalent of a lesser-included offense to counts one and two; and (3) the jury rendered three rejections of the theory that defendant did not intentionally kill the victim by unanimously finding defendant guilty of two counts of aggravated murder and one count of intentional murder.

 In *State v. Washington*, 273 Or 829, 836, 543 P2d 1058 (1975), this court provided the following framework concerning lesser-included offense instructions:

"[E]ither the defendant or the prosecution can request an instruction as to lesser offenses which are included either under the statutory definition or under the indictment charging the crime.

"The single limitation on the right of either the prosecution or the defendant to request lesser included offense instructions under [ORS 136.460 and ORS 136.465] is that there must be evidence, or an inference which can be drawn from the evidence, which supports the requested instruction so that the jury could rationally and consistently find

the defendant guilty of the lesser offense and innocent of the greater."

Furthermore, in *State v. Naylor*, 291 Or 191, 195, 629 P2d 1308 (1981), this court stated:

"A defendant is entitled to an instruction on lesser included offenses if there is a disputed issue of fact enabling the jury to find that all the elements of the greater offense have not been proven, but that all the elements of one or more of the lesser offenses have been proven."

Aggravated murder "may be defined as a murder that is committed 'intentionally,' plus something more. In that sense, intentional murder necessarily is a lesser-included offense of aggravated murder." *State v. Wille*, 317 Or 487, 494, 858 P2d 128 (1993); *see also State v. Isom*, 313 Or 391, 407, 837 P2d 491 (1992) ("The crime of intentional murder is 'necessarily included' in the crime of aggravated murder."). And, "an indictment for murder in the first degree 'necessarily involves all other grades of homicide which the evidence tends to establish,' " *State v. Wilson*, 182 Or 681, 684, 189 P2d 403 (1948), which would include first-degree manslaughter. Thus, defendant was entitled to an instruction that first-degree manslaughter is a lesser-included offense of aggravated murder, and the trial court erred in not giving that instruction under counts one and two.

Article VII (Amended), section 3, of the Oregon Constitution, however, "requires this court to affirm judgments of lower courts if, in the opinion of this court, the judgment achieved the correct result, even if error was committed." *Affeld*, 307 Or at 128. Further, we note that a jury instruction does not constitute reversible error unless it prejudiced the defendant when the instructions are considered as a whole. *State v. Williams*, 313 Or 19, 38, 828 P2d 1006 (1992). Thus, the issue here becomes whether the trial court's error was harmless.

In the present case, the record reflects that the trial court instructed the jury on the elements of aggravated murder (including the elements of burglary and robbery), intentional murder, and first-degree manslaughter, albeit not in the sequence that defendant requested. Furthermore, we

must presume that the jury followed the trial court's charge that it consider all of the jury instructions as a whole. *Smith*, 310 Or at 26. In any event, the case was submitted to the jury with complete and correct statements of the law necessary for it to properly determine whether the state had proved defendant's guilt on the crimes charged beyond a reasonable doubt. Thus, we find it difficult to posit that, in view of the jury instructions as a whole, defendant was prejudiced by the trial court's decision to instruct the jury on the lesser-included offense of first-degree manslaughter in relation to the intentional murder charge, rather than in relation to the aggravated murder charges. In our view, the trial court's instructions to the jury, as a whole, were sufficient to inform the jury of the possible verdicts it could return on the various charges, based on how it resolved the facts. Consequently, defendant was not prejudiced by the instructions themselves or the sequence in which they corresponded to the verdict form. We conclude, therefore, that the trial court's error was harmless.

## IV. PENALTY-PHASE ASSIGNMENTS OF ERROR

Defendant presents 12 assignments of error that pertain to the penalty phase of his trial. Five of those assignments of error raise issues pertaining to the consecutive sentences, which arose from the assault on Dalton. Defendant's arguments regarding those assignments of error are not well taken, and we do not discuss them further. However, defendant's remaining assignments of error present issues that warrant further discussion.

### A. *Evidence Regarding Defendant's Role in Prior Murder*

Four of defendant's assignments of error relate to state evidence presented during the penalty phase of defendant's trial concerning his role in the 1985 murder of Marjorie Kincaid.

In 1989, defendant pleaded guilty to a charge of accessory to murder after the fact in Nevada for his role in the death of Kincaid. While awaiting trial on that charge, defendant shared a prison cell with Dennis Ray Wright and spoke to him about the Kincaid murder. During the penalty

phase, Wright testified that defendant had admitted raping and murdering Kincaid.[12] Wright also testified that defendant had told Wright how he committed the crime, as well as how he had attempted to destroy any incriminating evidence. Finally, Wright testified that defendant had told him that, when the state failed to convict him, he was going to kill another woman and "make her squeal just like the pig did— the other pig that he killed."

Defendant argues that the trial court should have excluded the evidence regarding the Kincaid murder as unfairly prejudicial under OEC 403,[13] both because defendant was not prepared to defend against a second homicide and because that evidence was unduly inflammatory.[14] In response, the state contends that the trial court properly admitted the evidence regarding the Kincaid murder and that admission of that evidence did not violate OEC 403. The state asserts that evidence indicating that defendant committed a previous murder was directly relevant to two questions that the jury was required to consider for sentencing purposes: (1) "[w]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," and (2) "[w]hether the defendant should receive a death sentence." ORS 163.150(1)(b)(B), (D). In addition, the state points out that the trial court took measures to mitigate the potential for unfair prejudice.

---

[12] There were several discrepancies between the testimony Wright provided and the evidence that police officers uncovered. For example, Wright testified that defendant had admitted pistol whipping and raping Kincaid, but police officers had found no wounds on Kincaid consistent with being beaten with a pistol, and there had been no evidence of rape or sexual assault.

[13] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[14] Defendant also argues that, because the "future dangerousness question" of ORS 163.150(1)(b)(B) itself is unconstitutional, the state's evidence showing the he had committed the Kincaid murder was not admissible to prove that he probably would commit violent criminal acts in the future. As previously stated, defendant's constitutional argument in that regard is without merit.

As an initial matter, it is apparent that evidence of defendant's previous involvement in the Kincaid murder is relevant to prove defendant's propensity for future dangerousness. *See, e.g., State v. Pratt*, 309 Or 205, 210 n 3, 785 P2d 350 (1990), *cert den*, 510 US 969 (1993) (explaining that evidence of defendant's prior unrelated crimes "clearly would be admissible in the penalty phase as relevant to question two, defendant's future dangerousness"); *Montez*, 309 Or at 611 ("Because defendant's confessions of prior crimes were highly relevant to the jury's consideration of [the questions in ORS 163.150], we conclude that those confessions, even if uncorroborated, were properly admitted during the penalty phase of defendant's trial."). The trial court correctly concluded that evidence of defendant's involvement in the Kincaid murder was relevant.

Moreover, contrary to defendant's position on review, the trial court was not required to exclude the evidence regarding the Kincaid murder as unfairly prejudicial. In *Moore*, 324 Or at 407-08, this court determined that, "[i]n the context of OEC 403, 'unfair prejudice' means 'an undue tendency to suggest decisions on an improper basis, commonly although not always an emotional one.'" That is not the nature of the evidence here. As the trial court correctly concluded, the proffered evidence was prejudicial in the sense that it was highly probative, but not unfairly so.

Furthermore, the trial court took a number of measures to mitigate the potential for unfair prejudice. First, the trial court excluded from evidence all photographs regarding the Kincaid murder with the exception of those that depicted the ransacking of the Kincaid home. Therefore, although the jurors heard testimony concerning the Kincaid murder, those jurors did not view images likely to inflame or distract them. Second, as was his right, defendant had the opportunity to rebut the state's assertions regarding his involvement in the Kincaid murder. Finally, the trial court instructed the jury "to weigh the evidence calmly and dispassionately and to decide this case on its merits," as well as not "to allow bias, sympathy or prejudice any place in [its] deliberations."

Defendant's claim that the Kincaid evidence was unfairly prejudicial because he was unprepared to respond to

it is without merit. A party's lack of preparedness to meet evidence is not a factor under OEC 403 for determining whether that evidence should be excluded. Furthermore, defendant does not contend that he did not receive discovery concerning the evidence in question. Finally, the record indicates that defendant was prepared to and, in fact, did present evidence to rebut the state's theory of defendant's level of involvement in the Kincaid murder, as explained further below.

Defendant attempted to rebut the state's evidence regarding the Kincaid murder by introducing testimony from Christopher Bubel (Bubel). Bubel, an investigator for the Clark County Public Defender's Office in Las Vegas, Nevada, originally investigated the Kincaid murder. After Bubel testified, defense counsel asked the court to reopen examination of Bubel on "an issue as to whether or not [defendant] was capable, physically capable at the time of the Kincaid homicide to perform a homicide." The prosecutor objected on the ground that the testimony would be "hearsay from either a document or a doctor."[15] The trial court agreed and found Bubel's proposed testimony to be hearsay, "because it appears that Mr. Bubel would be giving his opinion based upon information that he had no personal knowledge of." The trial court did, however, offer defendant an opportunity to "put on an offer of proof." Defendant never made that offer of proof.

Defendant asserts that the trial court was obligated to admit defendant's evidence to rebut the assertion that defendant had committed the Kincaid murder. Defendant therefore claims that the trial court's exclusion of that evidence on hearsay and confusion grounds was error. Defendant also asserts that the trial court erred in excluding evidence that he was physically unable to commit the Kincaid murder. Defendant contends that that evidence was relevant to rebut the state's theory of that crime and because its admission neither would have confused the jury nor would have unduly delayed the trial.

---

[15] Defendant's witness would have testified that, "[a]ccording to the doctor's report[,] it would have been impossible for [defendant] to do the things he was accused of doing." The witness, however, could not recall the name of the doctor, but stated that he had all that information in a box somewhere.

In response, the state argues that, by failing to make an offer of proof as to the excluded evidence, defendant did not adequately preserve that claim.

This court previously has held that, to preserve a claim of error relating to the exclusion of evidence on relevance grounds, a party ordinarily must make an offer of proof as to the content of the excluded evidence. *State v. Wright*, 323 Or 8 at 13; *State v. Olmstead*, 310 Or 455, 459-60, 800 P2d 277 (1990); *see also State v. Busby*, 315 Or 292, 298, 844 P2d 897 (1993) (to preserve an issue regarding exclusion of evidence, "a defendant must at least * * * sufficiently outline the nature of his testimony so that the trial court, and the reviewing court, can [intelligently consider the ruling]"). Here, the trial court expressly offered defendant an opportunity to put Bubel's testimony on the record to preserve his argument that the evidence was wrongfully excluded. Defendant declined that opportunity, and, therefore, the trial court was not provided an occasion to reconsider the original ruling and correct any error. Furthermore, this court lacks the information necessary to determine whether the exclusion was erroneous and, if so, whether that error affected any of defendant's substantial rights.[16] Accordingly, we conclude that defendant has not preserved the issue for review.

In his next assignment of error, defendant argues that the trial court erroneously denied his request for a limiting instruction regarding evidence of his involvement with the Kincaid murder. According to defendant, when evidence is admissible for only a limited purpose, a trial court must provide an instruction ensuring the appropriate use of the evidence. In support, defendant relies on OEC 105, which provides:

> "When evidence which is admissible as to one party or for one purpose but not admissible to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

---

[16] *See* OEC 103 (providing that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected").

Defendant contends that, because the jury was permitted to consider the Kincaid evidence only in regard to the issue of future dangerousness, OEC 105 applies. Consequently, defendant argues that, without the appropriate instruction, "there was a high risk that the jury improperly considered the prior bad acts evidence as propensity evidence to decide that defendant committed the crime at issue in this case deliberately[.]" As a result, defendant claims that the trial court's refusal to provide a limiting instruction to the jury constituted reversible error.

■ The state responds by arguing that defendant's proposed jury instruction was improper. At trial, defendant requested the following jury instruction:

> "[Defendant] has pled guilty to accessory after the fact to the homicide involving Ms. Kincaid; [the prosecutor] is going to be presenting you evidence that's going to try to show that [defendant] had a more direct involvement in that homicide; that is offered solely for the purpose of you determining his future dangerousness."

The state claims that defendant's proposed instruction was not only an incorrect statement of the law, but that it also constituted an improper comment on the evidence.

ORS 163.150(1)(c)(B)[17] requires a trial court to instruct the jury to consider "any aggravating evidence," as well as mitigating evidence, in determining "[w]hether the defendant should receive a death sentence." ORS 163.150(1)(b)(D). Here, if the jury believed the state's evidence regarding the level of defendant's involvement in the Kincaid murder, the jury could consider that evidence as a form of aggravating evidence. Accordingly, because defendant's proposed jury instruction would have prevented the jury from considering such evidence, that instruction would have been erroneous. *See State v. Guzek*, 336 Or 424, 437, 86

---

[17] The jury instructions accompanying ORS 163.150(1)(b) are set out in ORS 163.150(1)(c), which provides, in part:

"(B) The court shall instruct the jury to answer the question in paragraph (b)(D) of this subsection 'no' if, after considering any aggravating evidence and any mitigating evidence concerning any aspect of the defendant's character or background, or any circumstances of the offense and any victim impact evidence as described in paragraph (a) of this subsection, one or more of the jurors believe that the defendant should not receive a death sentence."

P3d 1106 (2004) ("After the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B), the state now has an *additional* express statutory avenue to introduce evidence *against* a defendant, because it now may introduce 'any aggravating evidence' that is not relevant to the first three statutory questions and that pertains to a statutory question that is not subject to any burden of proof."). (Emphasis in original.) As a result, we conclude that the trial court correctly rejected defendant's proposed jury instruction.

## B. *Testimony of Defendant's Former Girlfriend*

Defendant claims that the trial court erred in sustaining the state's objection on relevance grounds to testimony that defendant should not receive the death penalty and in instructing the jury to disregard that testimony.

During the penalty phase, defense counsel asked defendant's former girlfriend, Cheryl Keil, the following question on cross-examination:

> "Ms. Keil, given all the good times that you've had with [defendant], all the bad times that you've had with [defendant], do you want this jury to impose the death penalty?"

The prosecutor objected, but Keil answered "[a]bsolutely not" before the trial court could rule on the objection. The trial court determined that the question was legitimate and allowed Keil to answer; Keil stated, "I do not believe that he should be put to death." During a subsequent recess, however, the trial court discussed the issue with counsel. The trial court determined that Keil's testimony lacked the proper foundation and therefore was not relevant to defendant's character or background, or any circumstances of the offense pursuant to ORS 163.150(1)(c)(B). The trial court based that decision on its reading of *Wright*, wherein this court had been unable to identify a rational connection between a lay witness's answer to the question, "Do you think that defendant should be given the death penalty?," and the criteria set out in ORS 163.150. 323 Or at 15-18. The trial court concluded that Keil's opinion as to whether defendant should receive the death penalty was only her "preference."[18]

---

[18] ORS 163.150(1)(c)(B) requires the court to instruct the jury to answer "no" to the fourth statutory question in ORS 163.150(1)(b)(D)—"[w]hether the defendant

Upon making that determination, the trial court asked if defense counsel had anything more to add on the matter, to which defense counsel replied, "No." The trial court then informed the jury that its previous ruling had been incorrect and instructed the jury to disregard Keil's answer to the question. Defendant made no objection to that instruction.

Relying on the Eighth and Fourteenth Amendments to the United States Constitution, defendant argues that the trial court's striking of Keil's testimony violated his constitutional right "to have the jury consider all mitigating evidence relevant to his case." Defendant contends that Keil's testimony was relevant to the fourth statutory question submitted to the jury during sentencing, that is, "[w]hether the defendant should receive a death sentence." ORS 163.150(1)(b)(D). Defendant asserts that the trial court misunderstood *Wright* because the court there "did *not* rule that lay opinion about whether a particular defendant's life should be spared is irrelevant" but that such evidence should be excluded only when it is "not logically tied to any facts at issue, such as information about the defendant's character or background." Here, defendant claims that Keil's opinion as to whether defendant should die, based on her relationship with him and her experiences with him—both good and bad "says something about his character." Defendant concludes that Keil's testimony "that she nevertheless felt that his redeeming qualities militated in favor of preserving his life was relevant to rebut the inferences that the state sought to have the jury draw—that his character for violence is so bad that he should die."

In response, the state argues that defendant's claim is unpreserved because defendant did not object to the trial court's decision to reverse its ruling or make an offer of proof to attempt to establish the requisite foundation under *Wright*. Consequently, the state concludes, defendant has not preserved an error for this court's review. Alternatively, the state contends that, in any event, the trial court's final ruling was a correct application of *Wright* because Keil's testimony

should receive a death sentence"—"if, after considering any aggravating evidence and any mitigating evidence concerning any aspect of the defendant's character or background, or any circumstances of the offense * * *, one or more of the jurors believe that the defendant should not receive a death sentence."

was not relevant to any aspect of defendant's character or background under ORS 163.150(1)(b)(D).

We conclude that defendant did not sufficiently tie Keil's testimony together with the criteria set out in ORS 163.150(1)(c)(B) and, therefore, that defendant failed to demonstrate the relevance of that evidence to any permissible theory of mitigation. Consequently, under *Wright*, the trial court correctly instructed the jury to disregard Keil's testimony. *Compare State v. Stevens*, 319 Or 573, 583-85, 879 P2d 162 (1994) (concluding that defendant's wife's testimony about anticipated negative effect of defendant's execution on his daughter was relevant to fourth question under ORS 163.150 because it permitted an inference that defendant's execution would affect his daughter negatively because of some mitigating aspect of defendant's character or background).

C. *Entry of Multiple Convictions and Sentences for Aggravated Murder*

Defendant next claims that the trial court erred by entering multiple convictions and imposing multiple sentences of death for count one (aggravated murder—death caused during robbery) and count two (aggravated murder—death caused during burglary).

The trial court entered separate judgments on count one and count two, each of which sentenced defendant to death for the murder of the victim. Defendant did not object to the court's failure to merge those convictions, but argues that this court should review the error as apparent on the face of the record. The state concedes that the trial court erred in entering separate judgments. We agree that the trial court erred when it entered two separate judgments and imposed two separate sentences of death, and that that error is apparent on the face of the record, as discussed below.

ORS 161.067(1) provides:

"When the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations."

In *State v. Barrett*, 331 Or 27, 10 P3d 901 (2000), the defendant was charged with and convicted of three counts of aggravated murder, based on three different aggravating circumstances involving the intentional killing of a single victim. There, this court concluded that, although the defendant properly was charged with and convicted of multiple counts of aggravated murder based on the existence of multiple aggravating circumstances, the defendant's conduct in intentionally murdering one victim did not violate "two or more statutory provisions." *Id.* at 31. In *Barrett*, this court interpreted the aggravated murder statute, ORS 163.095, and determined that

> "the harm that the legislature intended to address by ORS 163.095 was the intentional, aggravated killing of another human being. The aggravating factors constitute no more than different theories under which murder becomes subject to the enhanced penalties for aggravated murder. That defendant's conduct in intentionally murdering the victim in this case was 'aggravated' by 'any,' *i.e.*, one or more, act surrounding that conduct does not convert that conduct into more than one separately punishable offense."

*Id.* at 36. Accordingly, this court reversed the Court of Appeals' conclusion that the defendant's conduct consisted of three different crimes and remanded the case to the trial court for resentencing.

In *State v. Hale*, 335 Or 612, 630-31, 75 P3d 612 (2003), the jury convicted defendant on 13 counts of aggravated murder involving three victims, and the trial court entered multiple judgments and sentences of death for each victim. The defendant in *Hale* did not object to the imposition of those judgments and sentences, but later asked this court to review those sentences as error apparent on the face of the record. The state conceded that the trial court had erred. This court agreed that the sentencing was erroneous under *Barrett* and remanded the case for the trial court to enter corrected judgments reflecting a single conviction of aggravated murder for each victim. This court further required that each judgment enumerate separately the aggravating factors upon which each conviction was based and impose a single sentence of death. *Hale*, 335 Or at 631.

In light of the foregoing, we conclude that the trial court should have entered one judgment of conviction for the aggravated murder of the victim, which enumerated separately each aggravating factor and imposed one sentence of death. Accordingly, we reverse the judgments of conviction for aggravated murder on counts one and two, vacate the sentences of death imposed on those convictions, and remand to the trial court for entry of corrected judgments and resentencing. *See State v. Gibson*, 338 Or 560, 577-78, 113 P3d 423 (2005) (concluding that trial court's error in entering two convictions and two death sentences for the aggravated murder of one victim was apparent on the face of the record; remanding case for entry of corrected judgment merging both convictions, enumerating separately aggravating factors, and imposing single sentence of death).

D. *Merger of Murder Count with Aggravated Murder Counts*

Finally, defendant claims that the trial court erred by failing to merge his conviction of intentional murder with his convictions of aggravated murder for the death of the same victim.

In sentencing defendant for intentional murder, the trial court made the following statement:

"As to Count III, that is the Intentional Murder [Count], obviously that cannot be imposed should the Aggravated Murder death sentence be carried out. However, as we're all aware, there's going to be a long and lengthy process of appeal in this particular case so I am going to go ahead and sentence you on Count III which may avoid coming back here if they set aside Count I and II's sentence for any particular reason."

The trial court entered judgment on count three sentencing defendant to a term of imprisonment of 300 months, followed by post-prison supervision for the rest of defendant's life, to be served consecutively to the sentences imposed on the other counts. Defendant acknowledges that he did not object to the trial court's failure to merge the murder conviction with the aggravated murder convictions, but argues that this court should review the error as apparent on the face of the record. Defendant contends that, because intentional murder is a

lesser-included offense of aggravated murder, the jury in this case was not required to find any element to convict defendant of intentional murder that it was not also required to find to convict him of aggravated murder. Therefore, defendant concludes, the crimes are not separately punishable under ORS 161.067(1).

The state concedes that the trial court erred when it failed to merge defendant's murder conviction with his aggravated murder convictions and that the error is apparent on the face of the record. The state, however, urges this court not to consider defendant's claim of error, because it is unpreserved and is not "so egregious that this court should exercise its discretion to consider it." The state bases that position on the following reasoning:

> "[D]efendant has been sentenced to death for two counts of aggravated murder. If those convictions and the sentences of death are not vacated, the 300-month sentence imposed for count 3 will have no effect on defendant. Consequently, as a practical matter, the improper sentence *will* be merged into the greater sentences because, if the death penalty is carried out, defendant will never serve the sentence that was imposed on count 3 for intentional murder."

(Emphasis in original.) In our view, the state's argument contains too many contingencies.

As discussed above, this court determined in *Barrett* that the defendant's conduct in intentionally murdering the victim was "aggravated" by one or more acts surrounding that conduct, but was not thereby converted into more than one separately punishable offense. 331 Or at 36. Moreover, in *State v. Tucker*, 315 Or 321, 331, 845 P2d 904 (1993), this court stated:

> "A defendant may be punished separately for conduct or a criminal episode that violates two or more statutory provisions only if the following conditions are met: (1) the defendant engaged in acts that were the same conduct or criminal episode; (2) the defendant's acts violated two or more statutory provisions; and (3) each statutory provision requires proof of an element that the others do not. [ORS 161.067(1)]. This court has explained that those conditions are not met where one offense charged truly is a lesser included offense of another offense charged, that is, when

the former has no elements not also present in the latter, even though the latter has additional elements not present in the former. *State v. Crotsley*, 308 Or 272, 279-80, 779 P2d 600 (1989)."

*See also Isom*, 313 Or at 407 ("The crime of intentional murder is 'necessarily included' in the crime of aggravated murder.").

We therefore conclude that the trial court erred in not merging defendant's conviction for intentional murder with his convictions for aggravated murder and that that error is apparent on the face of the record. Accordingly, we reverse the judgment of conviction for intentional murder on count three, vacate the sentence imposed on that conviction, and remand to the trial court for entry of a corrected judgment and resentencing.

## V. CONCLUSION

In summary, we find that only defendant's assignments of error relating to the trial court's entry of multiple aggravated murder convictions and sentences of death, and the court's failure to merge defendant's conviction of intentional murder with his convictions of aggravated murder, are well taken. Accordingly, we remand the case for entry of a corrected judgment of conviction, reflecting defendant's guilt on the charge of aggravated murder, based upon alternative aggravating factors, and intentional murder, and imposing one sentence of death. We otherwise affirm the judgments of conviction and the sentences of death.

The judgments of conviction and sentences of death are affirmed. The case is remanded to the circuit court for further proceedings.