Dissent by Judge Ikuta
KOZINSKI, Circuit Judge:
We consider whether a district court’s policy of routinely shackling all pretrial detainees in the courtroom is constitutional.
BACKGROUND
In 2013, the judges of the Southern District of California acceded to the U.S. Marshals Service’s request for “a district-wide policy of allowing the Marshals Service to produce all in-custody defendants in full restraints for most non-jury proceedings.” “Full restraints” means that a defendant’s hands are closely handcuffed together, these handcuffs are connected by chain to another chain running around the defendant’s waist, and the defendant’s feet are shackled and chained together.
After seeking input from the U.S. Attorney’s Office, the Federal Defenders of San Diego and a Criminal Justice Act panel representative, the judges adopted the policy[1] of deferring to the Marshals’ shackling decisions, with a few minor exceptions. The judges retained discretion to “direct the Marshals to produce an in-custody defendant without restraints.” And the district judges, but not the magistrates, directed the Marshals to “remove arm and hand restraints during guilty pleas and sentencing hearings before them unless the Marshals [were] aware of information that the particular defendant need[ed] to be fully restrained.” Additionally, “defendants in individual cases may ask the judge to direct that the restraints be removed in whole or in part,” at which point the judge would “weigh all appropriate factors, including all of the concerns” expressed by the Marshals in justifying the routine use of full restraints. Only one district judge, Judge Marilyn Huff, opted out of the policy altogether. For the rest of the Southern District’s judges, the Marshals shackled all in-custody defendants at pretrial proceedings.
*654 Starting on the first day of the policy’s implementation, the Federal Defenders of San Diego objected to the routine use of shackles and requested that each defendant’s shackles be removed. The judges routinely denied the requests, relying on the Marshals Service’s general security concerns as well as concerns particular to the Southern District. They pointed to increasing security threats from what they viewed as changing demographics and increasing case loads in their district.[2] After ruling on a few individual objections, the judges indicated that they didn’t-“want to go through it a bunch of times.” “For the record,” one judge helpfully noted, “every defendant that has come out is in th[e] exact same shackling; so [counsel doesn’t] have to repeat that every time.”
The shackling was the same regardless of a defendant’s individual characteristics. One defendant had a fractured wrist but appeared in court wearing full restraints. The judge denied her motion “for all of the reasons previously stated.” Another defendant was vision-impaired. One of his hands was free of restraint so he could use his cane, but his other hand was shackled and secured to a chain around his waist and his legs were shackled together. His objection was “denied for all the reasons previously stated.” And another defendant was shackled despite being brought into court in a wheelchair due to her “dire and deteriorating” health. The court “noted” her objection to the shackles and “appreciate^] [counsel] not taking anymore time” with it.
The four defendants here, Rene Sanchez-Gomez, Moisés Patricio-Guzman, Jas-min Isabel Morales and Mark Ring, all appeared in shackles and objected to their use. The magistrate judges overruled the objections in each instance. Defendants appealed these denials to the district court and also filed “emergency motions” challenging the constitutionality of the district-wide policy. The district courts denied all relief. All four cases are now consolidated before us.[3]
ANALYSIS
A. Appellate Jurisdiction
1. In United States v. Howard, we considered shackling claims similar to the ones raised here. 480 F.3d 1005, 1008 (9th Cir. 2007). The Central District of California had adopted a routine shackling policy in consultation with the U.S. Marshals Service. Id. The policy required defendants to be shackled in leg restraints at their initial appearances. Id. The public defenders objected, claiming that the use of leg restraints on individual defendants violated the defendants’ liberty interests under the Fifth Amendment. Id. at 1009, 1013. They appealed the district court’s denial of the unshackling motions without waiting for the defendants’ criminal cases to conclude. Id.
We held that we had jurisdiction to review the district’s shackling decisions as immediately appealable collateral orders. Id. at 1011. Such orders “(1) conclusively determine[] the disputed question, (2) resolve[ ] an important issue completely separate from the merits of the action, and (3) [are] effectively unreviewable on appeal from a final judgment.” Sell v. United States, 539 U.S. 166, 176, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003) (internal quotation *655 marks, brackets and citation omitted). The government urges us to reconsider Howard, arguing that shackling decisions don’t satisfy the requirements for immediately appealable collateral orders.
Presented for our review in this appeal are individual shackling decisions as well as district-wide challenges to the shackling policy. The main dispute in this case, however, is the district-wide shackling policy. Because we do not review the individual defendants’ shackling decisions, we see no reason to revisit Howard’s appellate jurisdiction analysis as it applies to those appeals.
The district-wide challenges introduce a wrinkle in this case that Howard didn’t address. Defendants challenge the Southern District’s policy of routinely shackling in-custody defendants without an individualized determination that they pose a material risk of flight or violence. Defendants seek relief not merely for themselves, but for all in-custody defendants in the district. Thus, defendants are making class-like claims and asking for class-like relief.
Such claims are sometimes brought as civil class actions.[4] See, e.g., De Abadia-Peixoto v. U.S. Dep’t of Homeland Sec., 277 F.R.D. 572, 574 (N.D. Cal. 2011) (using a civil class action to challenge an Immigration and Customs Enforcement policy of shackling all detainees in San Francisco’s immigration court). But we can also construe such claims as petitions for writs of mandamus when we lack appellate jurisdiction and mandamus relief is otherwise appropriate. See Miller v. Gammie, 335 F.3d 889, 895 (9th Cir. 2003) (en banc). We “treat the notice of appeal as a petition for a writ of mandamus and consider the issues under the factors set forth in Bau-man.” Id. (citation omitted).
2. “The common-law writ of mandamus against a lower court is codified at 28 U.S.C. § 1651(a): ‘The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.’” Cheney v. U.S. Dist. Court for the Dist. of Columbia, 542 U.S. 367, 380, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004). “Historically, a writ of mandamus was an order compelling a court or officer to act.” In re United States, 791 F.3d 945, 953 (9th Cir. 2015).
Another use of the writ is to exercise our “supervisory” or “advisory” authority. Supervisory and advisory writs are appropriate in cases “involving questions of law of major importance to the administration of the district courts.” In re Cement Antitrust Litig. (MDL No. 296), 688 F.2d 1297, 1307 (9th Cir. 1982); see also La Buy v. Howes Leather Co., 352 U.S. 249, 259-60, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957) (“We believe that supervisory control of the District Courts by the Courts of Appeals is necessary to proper judicial administration in the federal system.”). This authority allows courts to provide broader relief than merely ordering that the respondent act or refrain from acting, which promotes the writ’s “vital corrective and didactic function.” Will v. United States, 389 U.S. 90, 107, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967); see also 16 Charles Alan Wright et al., Federal Practice and Procedure §§ 3934, 3934.1 (3d ed. 2016) (describing the history and modern usage of this authority).
*656 The Supreme Court has announced three conditions for issuing the writ: First, to ensure that the writ doesn’t replace the regular appeals process, there must be “no other adequate means to attain the relief’; second, the petitioner must have a “clear and indisputable” right to the writ; and, lastly, the court, in its discretion, must be “satisfied that the writ is appropriate under the circumstances.” Cheney, 542 U.S. at 380-81, 124 S.Ct. 2576 (internal quotation marks and citations omitted). These conditions are consistent with the five factors our circuit has used since Bauman v. U.S. Dist. Court, 557 F.2d 650 (9th Cir. 1977), to determine whether mandamus relief is appropriate:
(1) whether the petitioner has no other means, such as a direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal; (3) whether the district court’s order is clearly erroneous as a matter of law; (4) whether the district court’s order is an oft repeated error or manifests a persistent disregard of the federal rules; and (5) whether the district court’s order raises new and important problems or issues of first impression.
Hernandez v. Tanninen, 604 F.3d 1095, 1099 (9th Cir. 2010) (internal quotation marks omitted) (quoting Perry v. Schwarzenegger, 591 F.3d 1147, 1156 (9th Cir. 2009)); see also Bauman, 557 F.2d at 654-55.
All of the Bauman factors need not be present to justify the writ. See In re Cement Antitrust Litig., 688 F.2d at 1301, 1304 (noting that the fourth and fifth factors are rarely present in the same case). “Except for supervisory mándamus cases, the absence of factor three — clear error as a matter of law — will always defeat a petition for mandamus.” Calderon v. U.S. Dist. Court for the Cent. Dist. of Cal., 163 F.3d 530, 534 (9th Cir. 1998) (en banc), abrogated on other grounds by Woodford v. Garceau, 538 U.S. 202, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003). “In the final analysis, the decision of whether to issue the writ lies within our discretion.” In re Van Dusen, 654 F.3d 838, 841 (9th Cir. 2011) (citation omitted).
The Bauman and Cheney factors favor our review. There is no danger that the writ will supplant the normal appeals process because the district-wide shackling claims aren’t connected to defendants’ individual criminal cases.[5] The policy doesn’t apply to jury trials; thus, it causes no prejudice that would justify reversal of a conviction in a direct appeal. This case also raises new and important constitutional issues that haven’t been fully considered by this court. See United States v. Brandau, 578 F.3d 1064, 1065 (9th Cir. 2009). And a survey of our circuit’s district courts shows that some form of routine shackling has become a common practice and thus is an oft-repeated error.[6]
*657 Accordingly, we construe defendants’ appeals as petitions for writs of mandamus under our supervisory authority and find that we have jurisdiction to consider them.
B. Mootness
Article Ill’s “ease-or-controversy limitation” on federal court jurisdiction requires a live controversy between two adversaries. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Supervisory mandamus cases require live controversies even when we don’t order a lower court to take or refrain from a specific action. See In re United States, 791 F.3d at 952. Neither party claims that this case is moot, but the court “must assure itself of its own jurisdiction.” Terenkian v. Republic of Iraq, 694 F.3d 1122, 1137 (9th Cir. 2012). There are two circumstances in this case that raise the possibility of mootness: (1) the named defendants’ cases have ended, so they’re no longer subject to the complained-of policy, and (2) the challenged policy is no longer in effect.
1. “In cases where intervening events have rendered the writ an ineffective or superfluous remedy, but where the controversy nonetheless remains live, we have occasionally reviewed the district court’s decision for error while withholding a formal writ.” In re United States, 791 F.3d at 953 (citing Phoenix Newspapers, Inc. v. U.S. Dist. Court for the Dist. of Ariz., 156 F.3d 940, 952 (1998); United States v. Brooklier, 685 F.2d 1162, 1173 (9th Cir. 1982)). We do so when it would have been appropriate to issue the writ at the time the petition was filed. Id. at 954. This allows us to review “important issues that would otherwise escape review, while [e]n-suring that such review is limited to truly extraordinary circumstances.” Id.
Two of the defendants, Rene Sanchez-Gomez and Jasmin Isabel Morales, were not yet convicted and so were still subject to the pretrial shackling policy when they filed their notices of appeal. Construing their notices of appeal as petitions for writs of mandamus, they had a direct stake in the resolution of the controversy at the time their petitions were filed.
Named plaintiffs — or, in the mandamus setting, petitioners — must also have a continuing personal interest in the outcome of the case throughout the litigation. See Campbell-Ewald Co. v. Gomez, — U.S. -, 136 S.Ct. 663, 669, 193 L.Ed.2d 571 (2016). Because they are no longer subject to the policy, defendants’ personal interests in the outcome of this case have expired.
We faced the same issue in Howard. The defendants’ criminal cases ended before their shackling appeals could be heard. 480 F.3d at 1009-10. We held that the case wasn’t moot because it fell into the capable-of-repetition-yet-evading-review exception. Id. This exception requires repetition as to the particular complainants, and we cannot presume that defendants will be subject to criminal proceedings in the future. Id. But some criminal defendants would have been subject to the challenged policy during the litigation and would personally benefit from resolving the case. Thus, we employed the capable-of-repetition-yet-evading-review mootness exception that applied to the class action in Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Though Howard wasn’t a class action, the case served the same functional purpose — it was a func *658 tional class action. See 480 F.3d at 1009-10.
The Supreme Court in Gerstein applied the capable-of-repetition-yet-evading-review mootness exception even though the named plaintiff was no longer subject to the challenged practice. 420 U.S. at 110 n.11, 95 S.Ct. 854. In that case, the class was composed of defendants held in pretrial detention without a probable cause hearing. Id. at 105-06, 95 S.Ct. 854. It wasn’t clear that any representative plaintiff would remain in pretrial custody long enough for the judge to certify the class, much less decide the case. Id. at 110 n.11, 95 S.Ct. 854. But the class would continually fill with new in-custody defendants who had a live interest in the ease. Id. The attorney representing the class was a public defender who would continue to represent at least some of those new defendants and class members. Id. Under those circumstances, the Court held that the case wasn’t moot because the harm was capable of repetition yet evading review as to some member of the class throughout the litigation. Id.
We have applied Gerstein’s analysis to functional class actions with inherently transitory claims. See Howard, 480 F.3d at 1009-10; Or. Advocacy Ctr. v. Mink, 322 F.3d 1101, 1117-18 (9th Cir. 2003).[7] These cases involve circumstances “analogous to those found in class action cases where, because of the inherently transitory nature of the claims,” an individual’s interests would expire before litigation could be completed. Or. Advocacy Ctr., 322 F.3d at 1117. Functional class actions share the same three features that animated the Supreme Court in Gerstein: They challenge not merely individual violations, but also broader policies or practices. See id. at 1118. Thus, they consist of continually changing groups of injured individuals who would benefit from any relief the court renders. And they have common representation, thereby guaranteeing that the cases will be zealously advocated even though the named individuals no longer have live interests in the case. See id. at 1117.
The dissent disputes this application of Gerstein. According to the dissent, Ger-stein and related cases require “the existence of a procedural mechanism, such as [Federal Rule of Civil Procedure] 23,” for their mootness exceptions to apply. Dissent at 672-73. But the rule in Gerstein doesn’t turn on the presence of a procedural device like Rule 23. 420 U.S. at 110 n.11, 95 S.Ct. 854. Rather, Gerstein’s rule resolves the problem of inherently transitory claims while ensuring there is a live controversy for which the court can provide relief. Id.
The Supreme Court itself has indicated that Gerstein’s broadening of the capable-of-repetition-yet-evading-review mootness exception could apply to cases sufficiently similar to class actions. The Court discussed Gerstein’s factors in a case brought under the Fair Labor Standards Act (FLSA), Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 133 S.Ct. 1523, 185 L.Ed.2d 636 (2013). Unlike the class action procedures in Rule 23, the FLSA’s “ ‘conditional certification’ does not produce a class with an independent legal status.” Id. at 1530. The Court nonetheless considered whether, under Gerstein, the plaintiffs injury might be capable of repetition yet evading review. Id. at 1531; see also id. at 1530 (recognizing that the Court’s holdings in Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. *659 553, 42 L.Ed.2d 532 (1975), and U.S. Parole Commission v. Geraghty, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), depended on the “independent legal status” of class actions while making no such claim about Gerstein’s holding).
The dissent claims that Genesis Healthcare still requires “the existence of a procedural mechanism ... to aggregate the claims” as a “necessary prerequisite” for Gerstein’s analysis to apply. Dissent at 672-73. But the Court did not say so. Instead, the Court noted that its application of Gerstein has “invariably focused on the fleeting nature of the challenged conduct giving rise to the claim.” 133 S.Ct. at 1531. The dissent’s excursus on mootness also ignores that this is a supervisory mandamus case. See dissent at 668-76. In its supervisory mandamus role, a court of appeals properly addresses the harm of a district court policy affecting a huge class of persons who aren’t parties to the mandamus petition. See, e.g., Will, 389 U.S. at 95, 104-06, 88 S.Ct. 269; Schlagenhauf v. Holder, 379 U.S. 104, 110-12, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964); La Buy, 352 U.S. at 257-60, 77 S.Ct. 309. Unlike the dissent, see dissent at 674 n.5, the Supreme Court hasn’t found a constitutional infirmity with such cases. Thus, the dissent’s concerns about the lack of formal joinder and whether the decision binds other defendants, see id. at 672-74, are misplaced.
All of the Court’s considerations in Gerstein are present here, and the harm—unconstitutional pretrial shackling—is inherently ephemeral, just like the pretrial detention challenges in Gerstein. We are faced with an ever-refilling but short-lived class of in-custody defendants who are subject to the challenged pretrial shackling policy. At least some members of this functional class continue to suffer the complained-of injury. Most of the defendants are represented by the Federal . Defenders of San Diego. And even if we must withhold a formal writ, we can provide district-wide relief by exercising our supervisory mandamus authority, thus demonstrating that there is a live controversy here. See Knox v. Serv. Emps. Int’l Union, Local 1000, 567 U.S. 298, 132 S.Ct. 2277, 2287, 183 L.Ed.2d 281 (2012) (“A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.” (internal quotation marks and citations omitted)); see also In re United States, 791 F.3d at 954 (“[W]e are not categorically precluded from opining on the merits of a mandamus petition when issuance of the writ would no longer be effective.”).
2. Shortly after the original panel decision in this case, the Southern District of California changed its shackling policy in response to additional litigation about its continued use of five-point restraints. But the district court’s decision to change the policy was only a voluntary cessation. See Friends of the Earth, 528 U.S. at 189, 120 S.Ct. 693. The appealed policy could be reinstated at any time. In fact, the government has indicated that it will seek to reinstate the policy unless we hold it unconstitutional. Thus, there is still a live controversy over the shackling policy.
C. The Fundamental Right to be Free of Unwarranted Restraints
At the heart of our criminal justice system is the well-worn phrase, innocent until proven guilty. See Taylor v. Kentucky, 436 U.S. 478, 483, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978). And while the phrase may be well-worn, it must also be worn well: We must guard against any gradual erosion of the principle it represents, whether in practice or appearance. This principle safe *660 guards our most basic constitutional liberties, including the right to be free from unwarranted restraints. See Deck v. Missouri, 544 U.S. 622, 629-30, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005).
1. Under the Fifth Amendment, no person shall be “deprived of life, liberty, or property, without due process of law.” U.S. Const, amend. V. The Supreme Court has said time and again that “[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action.” Youngberg v. Romeo, 457 U.S. 307, 316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (alteration in original) (quoting Greenholtz v. Neb. Penal Inmates, 442 U.S. 1, 18, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (Powell, J., concurring in part and dissenting in part)). Liberty from bodily restraint includes the right to be free from-shackles in the courtroom. See Deck, 544 U.S. at 629, 125 S.Ct. 2007.
The Supreme Court held in Deck v. Missouri that “the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, unless that use is ‘justified by an essential state interest’— such as the interest in courtroom security — specific to the defendant on trial.” Id. at 624, 125 S.Ct. 2007 (quoting Holbrook v. Flynn, 475 U.S. 560, 568-69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)). In evaluating the government’s justification, a court may “take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.” Id. at 629, 125 S.Ct. 2007. While the decision whether to shackle is entrusted to the court’s discretion, routine shackling isn’t permitted. Id. at 629, 633, 125 S.Ct. 2007. Instead, courts must make specific determinations of necessity in individual cases. Id. at 633, 125 S.Ct. 2007.
The Supreme Court identified three constitutional anchors for the right: (1) the presumption that a defendant is innocent until proven guilty; (2) the Sixth Amendment right to counsel and participation in one’s own defense; and (3) the dignity and decorum of the judicial process, including “the respectful treatment of defendants.” Id. at 630-31, 125 S.Ct. 2007. In jury proceedings, an additional concern is that the sight of a defendant in shackles would prejudice the jury against him. Because prejudice is difficult to discern from a cold record, shackles visible to the jury are considered “inherently prejudicial.” Id. at 635, 125 S.Ct. 2007 (quoting Holbrook, 475 U.S. at 568, 106 S.Ct. 1340). But when security needs outweigh these other concerns, even visible restraints may be used. Id. at 632, 125 S.Ct. 2007.
Consistent with Deck, we have held that criminal defendants have a “constitutional right to be free of shackles and handcuffs in the presence of the jury absent an essential state interest that justifies the physical restraints.” Williams v. Woodford, 384 F.3d 567, 591 (9th Cir. 2004) (citations omitted). We require lower courts to consider concerns similar to those articulated by the Court in Deck, such as whether shackles would prejudice the jury, diminish the presumption of innocence, impair the defendant’s mental capabilities, interfere with the defendant’s ability to communicate with counsel, detract from the dignity and decorum of the courtroom or cause physical pain. See Spain v. Rushen, 883 F.2d 712, 721 (9th Cir. 1989). “ ‘In all [ ] cases in which shackling has been approved,’ we have noted, there has been ‘evidence of disruptive courtroom behavior, attempts to escape from custody, assaults or attempted assaults while in custody, or a pattern of defiant behavior toward corrections officials and judicial authorities.’” Gonzalez v. Pliler, 341 F.3d *661 897, 900 (9th Cir. 2003) (alteration in original) (quoting Duckett v. Godinez, 67 F.3d 734, 749 (9th Cir. 1995)).
We now clarify the scope of the right and hold that it applies whether the proceeding is pretrial, trial, or sentencing, with a jury or without.[8] Before a presumptively innocent defendant may be shackled, the court must make an individualized decision that a compelling government purpose would be served and that shackles are the least restrictive means for maintaining security and order in the courtroom.[9] See, e.g., Gonzalez, 341 F.3d at 900; Duckett, 67 F.3d at 748; Spain, 883 F.2d at 721, 728. Courts cannot delegate this constitutional question to those who provide security, such as the U.S. Marshals Service. Nor can courts institute routine shackling policies reflecting a presumption that shackles are necessary in every case.[10]
This right to be free from unwarranted shackles no matter the proceeding respects our foundational principle that defendants are innocent until proven guilty. The principle isn’t limited to juries or trial proceedings. It includes the perception of any person who may walk into a public courtroom, as well as those of the jury, the judge and court personnel. A presumptively innocent defendant has the right to be treated with respect and dignity in a public courtroom, not like a bear on a chain. See Zuber, 118 F.3d at 106 (Cardamone, J., concurring) (“The fact that the proceeding is non-jury does not diminish the degradation a prisoner suffers when needlessly paraded about a courtroom, like a dancing *662 bear on a lead, wearing belly chains and manacles.”).
And it’s not just about the defendant. The right also maintains courtroom decorum and dignity:
The courtroom’s formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual’s liberty through criminal punishment. And it reflects a seriousness of purpose that helps to explain the judicial system’s power to inspire the confidence and to affect the behavior of a general public whose demands for justice our courts seek to serve.
Deck, 544 U.S. at 631, 125 S.Ct. 2007. The most visible and public manifestation of our criminal justice system is the courtroom. Courtrooms are palaces of justice, imbued with a majesty that reflects the gravity of proceedings designed to deprive a person of liberty or even life. A member of the public who wanders into a criminal courtroom must immediately perceive that it is a place where justice is administered with due regard to individuals whom the law presumes to be innocent. That perception cannot prevail if defendants are marched in like convicts on a chain gang. Both the defendant and the public have the right to a dignified, inspiring and open court process. Thus, innocent defendants may not be shackled at any point in the courtroom unless there is an individualized showing of need.
2. This right “has deep roots in the common law.” Deck, 544 U.S. at 626, 125 S.Ct. 2007. The Supreme Court has “regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation’s history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.” Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (internal quotation marks and citations omitted).
One traditional justification for the right was allowing defendants to try their cases without the distraction of shackles and any attendant physical pain. See Deck, 544 U.S. at 626, 125 S.Ct. 2007; see also id. at 638-39, 125 S.Ct. 2007 (Thomas, J., dissenting).[11] An early commentator noted that defendants should approach the court free of shackles “so that their pain shall not take away any manner of reason, nor them constrain to answer, but at their free will.” Id. at 626, 125 S.Ct. 2007 (quoting 3 Edward Coke, Institutes of the Laws of England 34 (1797)). But the right was also motivated by the desire to protect defendants’ dignity:
[Ejvery person at the time of his arraignment, ought to be used with all the humanity and gentleness which is consistent with the nature of the thing, and under no other terror or uneasiness than what proceeds from a sense of his guilt, and the misfortune of his present circumstances; and therefore ought not to be brought to the bar in a contumelious manner; as with his hands tied together, or any other mark of ignominy and reproach; nor even with fetters on his feet, *663 unless there be some danger of a res-cous or escape.
2 William Hawkins, A Treatise of the Pleas of the Crown 434 (John Curwood, 8th ed. 1824). Still, there were certain situations when the need for security overcame the right to be free of shackles: “[A] defendant ‘must be brought to the bar without irons, or any manner of shackles or bonds; unless there be evident danger of an escape.’” Deck, 544 U.S. at 626, 125 S.Ct. 2007 (quoting 4 William Blackstone, Commentaries on the Laws of England 317 (1769)).
The Supreme Court in Deck found that the common law drew a distinction between trial and pretrial proceedings when applying the right because “Blackstone and other English authorities recognized that the rule did not apply at ‘the time of arraignment,’ or like proceedings before the judge.” Id. (quoting 4 Blackstone, Commentaries on the Laws of England 317) (citing Trial of Christopher Layer, 16 How. St. Tr. 94, 99 (K.B. 1722)). This statement on pretrial proceedings is undoubtedly dictum in a ease about shackling at capital sentencing. Persuasive Supreme Court dicta are usually heeded by lower courts. See United States v. Montero-Camargo, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc). But dicta “ought not to control the judgment in a subsequent suit, when the very point is presented for decision.” Humphrey’s Ex’r v. United States, 295 U.S. 602, 627, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (quoting Cohens v. Virginia, 19 U.S. 264, 399, 6 Wheat. 264, 5 L.Ed. 257 (1821) (Marshall, C.J.)). The Supreme Court’s dictum on pretrial proceedings in Deck doesn’t control this ease because it’s contradicted by the very sources on which the Supreme Court relied.[12]
The early commentators didn’t draw the bright line between trial and arraignment that the Deck Court seemed to believe they did. Coke’s discussion of shackling noted that “[i]t is an abuse that prisoners be charged with irons, or put to any pain before they be attainted.” 3 Coke, Institutes of the Laws of England 34. And Blackstone did not recognize that the rule against shackles didn’t apply at the time of arraignment or proceedings before a judge. Instead, the language the Court cited and partially quoted said the opposite: Shackles at arraignment and pretrial proceedings are acceptable only in situations of escape or danger.
The prisoner is to be called to the bar by his name; and it is laid down in our an[c]ient books, that, though under an indictment of the highest nature, he must be brought to the bar without irons, or any manner of shackles or bonds; unless there be evident danger of an escape, and then he may be secured with irons. But yet in Layer’s case, A.D. 1722[,] a difference was taken between the time of arraignment, and the time of trial; and accordingly the prisoner stood at the bar in chains during the time of his arraignment.
4 Blackstone, Commentaries on the Laws of England 317. Shackles at arraignment and trial are different, as Blackstone noted, but only because shackles are more easily justified at the former, which was demonstrated by Layer’s case.
Layer’s case, relied on by both Blackstone and the Supreme Court, began with Layer’s appeal to be unshackled at his arraignment. The Trial of Christopher Layer, esq; at the King’s-Bench for High-Treason, Nov. 21. 1722, in 6 A Complete Collection of State-Trials, and Proceedings Upon High-Treason 229-32 (2d ed. 1730). The government justified the shackles on *664 the ground that Layer had previously attempted to escape. Id. Layer’s lawyer objected strongly, explaining that “by Law he ought not to be called upon, even to plead, till his Fetters are off.” Id. at 231. He argued that shackles not only caused physical and mental “uneasiness,” but also that they besmirched the decorum of the court:
[Something of the Dignity of the Court might be considered in this Matter, for a ' Court of Justice, the highest in the Kingdom for criminal Matters, where the King himself is supposed to be personally present, to have a Man plead for his Life before them in Chains, seems to be very unsuitable. He is now before the same awful and just Tribunal which he’ will be before when he is tried, and why not therefore without Chains as well now as then ... ?
Id. While Layer was ultimately unsuccessful, his argument demonstrates that shackling at arraignment was not a standard practice, or even permissible, absent a demonstrated need.
The dissent struggles manfully against the plain language of Layer’s case and Blackstone. See dissent at 678-81. It claims to “follow the Supreme Court’s interpretation” of Layer’s case by pointing to Deck, id. at 680 n.13, but nowhere does the Deck majority analyze the case. We merely repeat what Blackstone and Layer’s case provide — that shackling at arraignment was allowed after a showing of need. Layer’s case applied the exception to Blackstone’s basic rule: A prisoner “must be brought to the bar without irons, or any manner of shackles or bonds; unless there be evident danger of an escape.” 4 Blackstone, Commentaries on the Laws of England 317. There’s nothing to indicate that shackles were used at arraignments more generally without a particular reason; Layer’s case suggests the contrary.
Early American courts “traditionally followed Blackstone’s ‘ancient’ English rule.” Deck, 544 U.S. at 626-27, 125 S.Ct. 2007 (collecting cases). Blair v. Commonwealth, relying on a legal encyclopedia, explained that courts followed “the common-law rule” that “shackling defendant[s] during arraignment, during the calling and examination of the jurors, or at any time during the trial, except in extreme cases to prevent escape or to protect the bystanders from the danger of defendant’s attack, [was] reversible error.” 171 Ky. 319, 188 S.W. 390, 393 (App. 1916) (internal quotation marks omitted) (quoting 12 William Mack, Cyclopedia of Law and Procedure 529 (1904)). Likewise, Rainey v. State quoted Bishop’s authoritative treatise to note that “ ‘the rule [against shackling] at arraignment where only a plea is required is less strict’” than the rule at trial. 20 Tex.App. 455, 472 (1886) (quoting 1 Joel Prentiss Bishop, Criminal Procedure § 955 (3d ed. 1880)). Contrary to the dissent’s belief, that the rule “is less strict” doesn’t mean it didn’t exist at all.[13] Bishop understood the common law rule just as we do: “[I]f a keeper deems it necessary,” then the general rule that the defendant “should not be in irons” at arraignment could be relaxed. 1 Bishop, Criminal Procedure § 731; see also Parker v. Territory, 5 Ariz. 283, 52 P. 361, 363 (1898) (“‘A person charged with a public offense shall not before conviction be subjected to any more restraint than is necessary for his detention to answer the charge,’ — which is *665 but the common-law and constitutional right of a prisoner embodied in the statute.” (citation omitted)). Thus, we have a tradition dating from time out of mind that defendants will appear in court prior to their conviction as free men with their heads held high.
3. The government contends that individualized determinations are required only before shackles are used in the jury’s presence. Otherwise, it argues, the right is sufficiently protected by considering generally applicable security concerns, deferring to the U.S. Marshals Service and leaving the rest to individual judges’ discretion. The government also asks us to analyze this case under Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).
But Bell dealt with pretrial detention facilities, not courtrooms.[14] Those facilities are meant to restrain and keep order, not dispense justice. They are a mere step away from detention in prison. We emphatically reject the idea that courtrooms are (or should be) perceived as places of restraint and punishment, or that courtrooms should be governed exclusively by the type of safety considerations that justify detention facility policies. We must make every reasonable effort to avoid the appearance that courts are merely the frontispiece of prisons.
We have a long tradition of giving correctional officials a wide berth in maintaining security within their own facilities.[15] See id. at 540 n.23, 99 S.Ct. 1861. But we don’t have a tradition of deferring to correctional or law enforcement officers as to the treatment of individuals appearing in public courtrooms. In the courtroom, law enforcement officers have no business proposing policies for the treatment of parties as a class. Insofar as they have information pertaining to particular defendants, they may, of course, bring it to the court’s attention. But a blanket policy applied to all defendants infuses the courtroom with a prison atmosphere. The Marshals Service should not have proposed it and the judges should not have paid heed.
We must take seriously how we treat individuals who come into contact with our criminal justice system — from how our police interact with them on the street to how they appear in the courtroom. How the justice system treats people in these public settings matters for the public’s perception, including that of the defendant. Practices like routine shackling and “perp walks” are inconsistent with our constitutional presumption that people who have not been convicted of a crime are innocent until proven otherwise. That’s why we must examine these practices more skeptically than those deployed in an institutional setting like Bell. See, e.g., Deck, 544 U.S. at 634, 125 S.Ct. 2007 (holding that a defendant’s Fifth Amendment rights were violated by visible shackling before a jury at capital sentencing proceedings); Lauro v. Charles, 219 F.3d 202, 212-13 (2d Cir. 2000) (holding that a defendant’s Fourth Amendment rights were violated by a staged and filmed perp walk done without a legitimate law enforcement reason). We must treat people with respect and dignity even though they are suspected of a crime.
[[Image here]]
*666 The Constitution enshrines a fundamental right to be free of unwarranted restraints. Thus, we hold that if the government seeks to shackle a defendant, it must first justify the infringement with specific security needs as to that particular defendant. Courts must decide whether the stated need for security outweighs the infringement on a defendant’s right. This decision cannot be deferred to security providers or presumptively answered by routine policies. All of these requirements apply regardless of a jury’s presence or whether it’s a pretrial, trial or sentencing proceeding. Criminal defendants, like any other party appearing in court, are entitled to enter the courtroom with their heads held high.
The policy that defendants challenged here isn’t presently in effect. Thus, although we hold that policy to be unconstitutional, we withhold the issuance of a formal writ of mandamus at this time.
DENIED.

. Several district judges avoid the term “policy” and instead claim it’s just a practice. We don’t see the difference.

. Evidence presented in a mandamus proceeding that transpired during the course of this appeal indicates that the Southern District's case load was increasing up to the year preceding the adoption of the routine shackling policy. But after 2012, case loads decreased and, as of 2015, had reached their lowest level in years.

. Defendants also appealed discovery and re-cusal decisions. We don’t reach these issues.

. We noted, in Howard that indigent defendants have little ability to bring civil class actions as a practical matter. 480 F.3d at 1010. They aren’t guaranteed counsel to pursue civil rights claims, cf. Fed. R. Crim. P. 44, and defender organizations — like the Federal Defenders of San Diego — ordinarily have limited mandates that do not include tiling class actions on behalf of their clients. See 18 U.S.C. § 3006A(g)(2).

. While these are criminal cases, they aren't subject to special criminal mandamus petition rules. The dissent discusses Will v. United States as though it narrowed the availability of the writ of mandamus in criminal cases. See dissent at 675-76. It didn't. The Supreme Court in Will explained that courts of appeals may resolve erroneous district court practices through mandamus petitions, even in criminal cases. 389 U.S. at 104-05, 88 S.Ct. 269 (discussing La Buy, 352 U.S. at 258, 77 S.Ct. 309). That's exactly what we do here. The Court also cautioned that mandamus petitions brought by the government in criminal cases raise concerns about speedy trials and double jeopardy. Id. at 96-98, 88 S.Ct. 269. None of those concerns are applicable here.

. The dissent faults us for “equat[ing] a good faith effort to follow our case law” with a clear and repeated error. Dissent at 676. According to the dissent, "the district court complied with our last word on the matter, Howard.” Id. at 676. The dissent errs. We *657 explicitly noted in Howard that the policy we were addressing was "less restrictive than the previous policy requiring full restraints.” 480 F.3d at 1014. Nothing in Howard endorsed the routine use of full restraints.

. Contrary to the dissent’s claim, dissent at 674-75, Oregon Advocacy Center was not just about associational standing. After determining that the plaintiffs had standing to bring the suit, we then turned to whether the case was moot — a distinct issue. Compare 322 F.3d at 1108-16 (discussing standing), with id. at 1116-18 (discussing mootness).

. The Second Circuit in a pre-Deck case, United States v. Zuber, did not recognize a right to individualized shackling determinations before a sentencing judge. 118 F.3d 101, 104 (2d Cir. 1997). But the court didn't hold that no liberty interest was at issue in nonjuiy courtroom shackling. Its analysis was limited to whether there would be inherent prejudice in the mind of the sentencing judge seeing the defendant in shackles as there would be in front of a guilt-phase jury. Id. at 103-04.
Likewise, the Eleventh Circuit in United States v. LaFond held that a defendant wasn’t entitled to an individualized shackling determination before a sentencing judge. 783 F.3d 1216, 1225 (11th Cir. 2015). The court in LaFond went further than Zuber, saying that "the rule against shackling pertains only to a jury trial." Id. In reaching this conclusion, the Eleventh Circuit disregarded the common law rule embodied in our Constitution that protects an individual from unwarranted shackles in the courtroom, regardless of the presence of a jury. See infra pp. 662-65. Moreover, it failed to consider the three essential interests that Deck identified for deciding shackling cases.

. An individual determination cannot resemble what the Southern District judges did here. Courts may not incorporate by reference previous justifications in a general fashion, nor may they refuse to allow defendants to make objections or create evidentiary records. And they cannot flip the presumption against shackling by requiring that the defendant come up with reasons to be ««shackled.
The Southern District’s reliance on postdepri-vation process is unconstitutional not only because it often results in no opportunity to be heard at all, but also because many judges failed to exercise discretion when faced with inappropriate shackling. These judges shackled a blind man, a woman in a wheelchair with "dire and deteriorating” health and a woman with a broken wrist. And despite the policy providing that shackles wouldn’t be used at sentencing hearings without specific security information showing an individualized need, the defendant in the wheelchair was also shackled at her sentencing hearing. See supra p. 653. The hearing transcript indicates that no evidence of such specific security information was introduced. Routine shackling subject to postdeprivation review is plainly insufficient to protect this fundamental constitutional right.

.We therefore overrule Howard to the extent it held that a routine shackling policy largely justified by deference to the U.S. Marshals Service was constitutional.

. The dissent relies heavily on the give and take between Justice Thomas and the majority on a matter not central to the majority’s holding. See dissent at 678-79. But the Court has recognized that such byplay is not binding if it does not concern the majority’s holding. Kirtsaeng v. John Wiley & Sons, Inc., 568 U.S. 519, 133 S.Ct. 1351, 1368, 185 L.Ed.2d 392 (2013) (dismissing as dictum a contrary statement of law in a previous opinion, explaining that it was merely "contained in a rebuttal to a counterargument”).

. "Is the Court having once written dicta calling a tomato a vegetable bound to deny that it is a fruit forever after?” Kirtsaeng, 133 S.Ct. at 1368.

. The dissent fails to engage with these cases and cites no secondary sources with the view of shackling at arraignment that it espouses. Authoritative secondary sources such as Bishop’s treatise and Mack’s encyclopedia provide us with a panorama of the law as it was generally understood and applied by a majority of courts at the time.

. The dissent expands the scope of Bell to the courtroom by claiming that "[t]he government’s interest in securing [pretrial detainees’] presence at trial and maintaining order and security ... remains the same regardless of the location.” Dissent at 682. Location matters, however. The courtroom is not a pretrial detention facility.

. We need not consider the application of Bell to holding cells or transportation between detention centers and the courtroom, which are beyond the scope of this case.