JAMES, J., concurring.
A Lincoln County grand jury charged petitioner with a multitude of serious felonies. For two weeks in January 2011, petitioner was tried before a jury on those charges. Throughout that trial, petitioner was shackled. Not in old fashioned chains or irons, but by wearing under his clothing a "Band-It," an electro-shock restraint device, commonly, though somewhat inaccurately, referred to as a stun belt. The decision to shackle petitioner throughout trial did not come following a hearing, at which the state would have presented evidence of petitioner's particular safety risk, or his history of violence, or his intent to disrupt the court decorum. Rather, the record reveals that petitioner wore the device because, pursuant to a local court order, all incarcerated criminal defendants in Lincoln County wore such a device at trial when appearing in civilian clothing. Petitioner's trial attorney offered no objection.
Petitioner sought post-conviction relief, arguing that his trial attorney was constitutionally inadequate and ineffective in failing to object to his shackling. In support *526 of his claim, petitioner testified that the device affected his thought process throughout trial. Petitioner testified, in part:
"While I was in jail, about a month before trial, I saw one of the guys in jail get tazed. The inmate got stiff, fell to the ground, hit his head, and urinated himself in front of everyone. * * * When they had me sign the notice and wear the shock restraint device, I thought back to that guy in the jail and I was scared. I was afraid that I'd get shocked and pee myself in front of everyone."
The post-conviction court found all of petitioner's statements noncredible, finding:
"The testimony of his attorney and the district attorney as well as the transcript of the trial reflects that Petitioner testified at length and in great detail and that there was no evidence of reluctance or inhibition. * * * Petitioner was also actively engaged in conversation with the deputies and others during breaks. There was no indication that he was nervous, subdued or apprehensive. * * * Petitioner's claim that he was terrified that the device would accidently be activated is likewise not credible. He was advised of what type of actions could result in activation of the device. The switch on the deputy's belt had a safety guard and required insertion of the finger to activate the switch. Had Petitioner actually been fearful about the possibility of accidental activation of the security devise one would expect him to mention it to his attorney at some point during the multi-day trial."
Ultimately, the post-conviction court denied relief, concluding that petitioner's trial counsel's failure to object to the shackling was not constitutionally deficient performance, and that, even if it were, petitioner had not established prejudice as a result of the shackling, because the court found petitioner's testimony not credible on that point. In determining that defense counsel's failure to object was not deficient, the post-conviction court reasoned that "[t]he case of State v. Wall , [252 Or. App. 435, 287 P.3d 1250 (2012), rev. den. , 353 Or. 280, 298 P.3d 30 (2013) ] * * * was not decided until after the Petitioner's trial took place. * * * Petitioner's attorney was not ineffective for not anticipating *486 the Wall decision." As to the issue of prejudice, the post-conviction court reasoned, "Where a non-visible security device is used at trial, prejudice is not presumed." *527 In this per curiam opinion, we affirm the post-conviction court's denial of relief, relying on our decision in Sproule v. Coursey , 276 Or. App. 417, 367 P.3d 946, rev. den. , 359 Or. 777, 381 P.3d 818 (2016). In Sproule , relying on our decision in Bates , we noted that there were three types of prejudice as a result of shackling: " '(1) impingement on the presumption of innocence and the dignity of judicial proceedings; (2) inhibition of the accused's decision whether to take the stand as a witness; and (3) inhibition of the accused's consultation with his or her attorney.' " 276 Or. App. at 424, 367 P.3d 946 (quoting State v. Bates , 203 Or. App. 245, 251, 125 P.3d 42 (2005), rev. den. , 340 Or. 483, 135 P.3d 318 (2006) ).
Sproule drew a distinction, however, as to when prejudice would be presumed and when prejudice would need to be established by a post-conviction petitioner.
"Thus, where the record shows that a criminal defendant was restrained in a manner that could not be effectively shielded from the jury's view, there is a presumption that the shackles are seen by the jury and prejudice results.
"In contrast, if a defendant is restrained in a manner that is not visible to the jury, prejudice will not be presumed."
Sproule , 276 Or. App. at 424-25, 367 P.3d 946 (internal citations and quotation marks omitted).
Sproule grounded that decision, in part, on State v. Bowen , 340 Or. 487, 135 P.3d 272 (2006). There, the Oregon Supreme Court declined, in the posture of a direct appeal, to review a plain error challenge to the constitutionality of the use of a stun belt, noting:
"There is no evidence in the record that the stun belt that defendant wore at trial was visible to the jury, and, therefore, defendant cannot claim that the jury was biased by its presence. Furthermore, defendant failed to provide evidence or point to anything in the record indicating that the stun belt affected his ability to assist in his defense. Because defendant is unable to satisfy the third element of the plain error criteria, this court will not consider defendant's unpreserved claim of error."
Id. at 496, 135 P.3d 272.
*528 In reaching a distinction between shackling that was visible to a jury versus shackling that was not visible to a jury, Sproule hewed closely to the federal analysis offered a decade earlier in Deck v. Missouri , 544 U.S. 622, 635, 125 S.Ct. 2007, 161 L. Ed. 2d 953 (2005). There, the United States Supreme Court held that "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation." Id. at 635, 125 S.Ct. 2007. In holding that there was no need for an individualized showing of prejudice when shackling is visible to the jury, Deck relied on Holbrook v. Flynn , where the Court declared that some "practices pose such a threat to the 'fairness of the factfinding process' that they must be subjected to 'close judicial scrutiny' " and were "inherently prejudicial." 475 U.S. 560, 568, 106 S.Ct. 1340, 89 L. Ed. 2d 525 (1986) (quoting Estelle v. Williams , 425 U.S. 501, 503-04, 96 S.Ct. 1691, 48 L. Ed. 2d 126 (1976) ).
In this case, petitioner asks us to disavow Sproule , advancing a very narrow argument, asserting only that it is contradictory to our holdings in Cunningham v. Thompson , 186 Or. App. 221, 62 P.3d 823, adh'd to as modified on recons ., 188 Or. App. 289, 71 P.3d 110 (2003), rev. den. , 337 Or. 327 (2004) and Davis v. Armenakis , 151 Or. App. 66, 948 P.2d 327 (1997), rev. den. , 327 Or. 83, 961 P.2d 217 (1998).[1] I agree that Sproule is controlling and, because I conclude that petitioner's narrow argument challenging Sproule does not suffice to overcome the strong principle of stare decisis , I join in the majority per curiam opinion.
*487 However, I write separately for two reasons. First, I believe it is important to make clear which aspects of the post-conviction court's ruling the majority opinion does, and does not, affirm. The majority does not rely on Wall to affirm the post-conviction court as to performance of trial counsel and, if it did so, I would dissent. The post-conviction court's conclusion that constitutionally adequate counsel could not *529 reasonably be expected to object, prior to Wall , to a non-visible restraint of their client, without any individualized factual basis for such a restraint, is incorrect. Wall itself noted the long history of the principle that the accused has the right "to be free from physical restraint during a criminal trial." 252 Or. App. at 437, 287 P.3d 1250. In addition, as Wall noted, we have long held that "physically restraining a defendant implicates Article I, section 11, of the Oregon Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Id . (relying on State v. Merrell , 170 Or. App. 400, 403, 12 P.3d 556 (2000), rev. den. , 331 Or. 674, 21 P.3d 96 (2001) ).
Second, I write because I am deeply troubled-both by the ubiquitousness of shackling occurring throughout courts in Oregon and by the inadequacy of our treatment of that issue in Oregon law. I am troubled by our failure to meaningfully recognize the effect that shackling injects into a court proceeding-on the defendant, on counsel, on the factfinder, and on the public perception of innocence and justice. And I am troubled by the ease with which we rely upon an analytical model for prejudice that largely tracks the model developed for federal constitutional purposes without adequate consideration of provisions of the Oregon Constitution, which alter some of the fundamental assumptions that undergird the federal model. I will address each of those concerns in turn.
At the outset, it cannot reasonably be denied that there are times when a defendant must be shackled. The circuit courts of this state routinely hear cases where a defendant displays serious violent, impulsive behavior-cases where a defendant poses a very real danger to himself, his accuser, the corrections staff, and the court personnel. In those circumstances, it may be incumbent on the trial judge to protect the defendant and others through the use of restraints. But, even in those circumstances, it is important to be ever mindful of what is at the heart of the issue.
The law often speaks of the presumption of innocence. The use of the term presumption can be misleading-a qualification that can obscure the absolute nature of the point. Presumptions are guides to reasoning, not *530 evidentiary proof, and "[a] rule of presumption does not merely say that such and such a thing is a permissible and usual inference from other facts, but it goes on to say that this significance shall always, in the absence of other circumstances, be imputed to them." James Bradley Thayer, A Preliminary Treatise on Evidence At The Common Law , 317 (1898). Said another way, a defendant is not presumed innocent as legal fiction unreflective of reality-a defendant is innocent and it is only the power of the verdict that can transform him from that state.
The innocence of all defendants, unless and until a verdict alters that reality, is the underpinning of every aspect of the justice system. "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." Coffin v. United States , 156 U.S. 432, 453, 15 S.Ct. 394, 39 L. Ed. 481 (1895). The innocence of the defendant is central to all stages of the case, not merely trial. As Wigmore notes, "The presumption of innocence hovers over the prisoner as a guardian angel from the moment of indictment until the verdict is determined." John Henry Wigmore, Evidence in Trials at Common Law , 504 (2d ed. 1923). When approaching the issue of shackling, this principle must be central to the analysis: We are talking about the shackling of the innocent .
Sproule recognizes that there are differing reasons prohibiting shackling without individualized determinations, noting three in particular: "(1) impingement on the presumption of innocence and the dignity of judicial proceedings; (2) inhibition of the accused's decision *488 whether to take the stand as a witness; and (3) inhibition of the accused's consultation with his or her attorney." Sproule , 276 Or. App. at 424, 367 P.3d 946.
Similarly, Deck draws three principal rationales. First, noting that shackling can influence the "factfinding process" and subtly show that "the justice system itself sees a need to separate a defendant from the community at large." Deck , 544 U.S. at 630, 125 S.Ct. 2007 (internal quotation marks omitted). Second, Deck focuses on how shackling can physically *531 and psychologically interfere with the right to counsel and the ability to participate in one's own defense, noting that shackling imposes " 'physical burdens, pains, and restraints ..., ... [and tends] to confuse and embarrass' defendants' 'mental faculties,' and thereby tend[s] 'materially to abridge and prejudicially affect his constitutional rights.' " Id . at 631, 125 S.Ct. 2007 (quoting People v. Harrington , 42 Cal. 165, 168 (1871) ) ( (ellipses in Deck ) ). Finally, Deck speaks to the effect on public perception and confidence in the judicial system routinized shackling has:
"[J]udges must seek to maintain a judicial process that is a dignified process. The courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment. And it reflects a seriousness of purpose that helps to explain the judicial system's power to inspire the confidence and to affect the behavior of a general public whose demands for justice our courts seek to serve."
Deck , 544 U.S. at 631, 125 S.Ct. 2007.
None of the concerns expressed in Sproule or Deck are confined to juries. Shackling can confuse, embarrass, and affect a defendant in a bench trial, or a settlement conference, or a pretrial matter, as easily as a jury trial. And routinized shackling of defendants inspires no greater confidence in the judicial system if it only occurs when the jury is not present. In fact, the opposite may be true-for the truest test of the confidence we should imbue to the justice system is how it treats people when the public is not looking.
Finally, the effect shackling has on a factfinder is not limited to juries. Judges do not become immune to the inherent, unconscious, biases present in the human mind by virtue of their office. As recently noted by the Ninth Circuit:
"The principle isn't limited to juries or trial proceedings. It includes the perception of any person who may walk into a public courtroom, as well as those of the jury, the judge and court personnel. A presumptively innocent defendant has the right to be treated with respect and dignity in a public courtroom, not like a bear on a chain."
*532 United States v. Sanchez-Gomez , 859 F.3d 649, 661 (9th Cir.), cert. granted in part , --- U.S. ----, 138 S.Ct. 543, 199 L.Ed.2d 422 (2017), vac'd and rem'd , --- U.S. ----, 138 S.Ct. 1532, 200 L.Ed.2d 792 (2018). And that is my first concern-that Sproule 's presumption of prejudice only when shackles are visible to the jury may carry an unintended consequence of subtly delegitimizing the broader rationales behind the prohibition.
My second concern is more practical. The rule in Sproule , and Deck , can be read as a concession to the reality that sometimes prejudice becomes impossible to show via evidentiary proof. Years after a conviction, when the post-conviction case arises, a petitioner cannot realistically locate the individual jurors to determine if they were influenced by the sight of shackles, nor is there a public value in having those jurors disturbed. The presumption of prejudice when the shackles are visible recognizes this difficulty inherent in "a cold record." Sanchez-Gomez , 859 F.3d at 660.
However, there exist other situations where prejudice is presumed. In Strickland v. Washington the Court listed, "Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance. * * * [P]rejudice is presumed when counsel is burdened by an actual conflict of interest." 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L. Ed. 2d 674 (1984). As Strickland explained, "Prejudice in these circumstances is so likely that case-by-case *489 inquiry into prejudice is not worth the cost." Id . With respect to the effect of shackling on the mind of a defendant, in particular when the restraint is an electro-shock device like the Band-It, as in this case, we have never addressed whether an individualized showing is "worth the cost" or whether prejudice could not simply be presumed.
As the record in this case demonstrates, the Band-It is a device that can deliver a 50,000 volt electro-shock to the wearer by means of a remote switch. The Band-It measures approximately two inches by four inches by seven inches and is placed in a carrier/sleeve that is covered by the clothing. Other courts, in considering similar devices, have noted the effects of the device's usage:
*533 "The [device] will deliver an eight-second, 50,000-volt electric shock if activated by a remote transmitter which is controlled by an attending officer. The shock contains enough amperage to immobilize a person temporarily and cause muscular weakness for approximately 30 to 45 minutes. The wearer is generally knocked to the ground by the shock and shakes uncontrollably. Activation may also cause immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. An electrical jolt of this magnitude causes temporary debilitating pain and may cause some wearers to suffer heartbeat irregularities or seizures."
People v. Mar , 28 Cal. 4th 1201, 1215, 124 Cal.Rptr.2d 161, 52 P.3d 95, 103 (2002), as modified (Sept. 11, 2002) (internal citations and quotation marks omitted).
The morning of trial, petitioner was given a form to sign that explained the Band-It. That form read, in part:
"This system contains 50,000 volts of electricity. By means of a remote transmitter, an attending deputy has the ability to activate the stun package attached to you, thereby possibly causing the following results to take place:
"1. Immobilization causing you to fall to the ground.
"2. Possibility of self-defecation.
"3. Possibility of self-urination."
An electro-shock device, like the one used on petitioner, is a psychological weapon-one apparently so over-whelmingly effective in altering the behavior of defendants that, according to this record, since instituting use of the Band-It in 2002, Lincoln County corrections officials have never actually had to use it. Manufacturers laud the profound psychological impact of these types of devices in their sales literature. "Stun-Tech's literature promotes the belt to law enforcement officials as necessary 'for total psychological supremacy ... of potentially troublesome prisoners.' " Shelley A. Nieto Dahlberg, The React Security Belt: Stunning Prisoners and Human Rights Groups Into Questioning Whether Its Use Is Permissible Under the United States and Texas Constitutions , 30 St Mary's L J 239, 252 (1998) (ellipsis in original). In the Band-It "End-User Certification *534 Training Program" materials in this record, the manufacturer describes the device as achieving "control" through "psychological dominance." That literature makes clear that "[b]y strapping and securing the device on an individual, the element of control is being demonstrated by psychological power." The manufacturer boasts that the device "exhibit[s] unprecedented and unbelievable power" over those who wear it.
In light of the fact that the device is designed, intended, and, apparently, very successful in psychologically dominating even the most troublesome defendant, Sproule 's limit of a presumption of prejudice to only when shackles are visible to the jury may be overly narrow. Since an essential purpose of a stun device is to affect a defendant psychologically, it may be worth asking whether a case-by-case inquiry into whether the device worked as intended has any value. In short, our decisions do not address whether there is any practical utility in requiring a petitioner to make an individualized evidentiary showing that he was psychologically affected by a device whose engineered and advertised purpose is to psychologically affect him .
My final concern in this area comes about due to the unique nature of the Oregon Constitution. The Eighth Amendment to the United States Constitution provides that *490 "[e]xcessive bail shall not be required." In contrast, Article I, section 14, of the Oregon Constitution provides that "[o]ffences [sic ], except murder, and treason, shall be bailable by sufficient sureties." (Emphasis added.). As the Oregon Supreme Court has recognized, the "right to bail" embodied in Oregon's Constitution is a "revolutionary" concept and one directly at odds with the federal model:
"The concept of a right to bail, as set forth in Article I, section 14, and in similar provisions in the constitutions of other states, was foreign to the English court system, just as it is foreign to the system of bail in the federal judicial system under the Eighth Amendment."
Priest v. Pearce , 314 Or. 411, 417, 840 P.2d 65 (1992).
This is not a theoretical distinction, but one with practical consequences. In a federal prosecution, preventative *535 pretrial detention through bail denial is permissible. See United States v. Salerno , 481 U.S. 739, 754-55, 107 S.Ct. 2095, 95 L. Ed. 2d 697 (1987) (Eighth Amendment does not grant absolute right to bail); United States v. Edwards , 430 A.2d 1321, 1331 (DC 1981) ("While the history of the development of bail reveals that it is an important right, and bail in noncapital cases has traditionally been a federal statutory right, neither the historical evidence nor contemporary fundamental values implicit in the criminal justice system requires recognition of the right to bail.").
Under the federal statutory scheme for pretrial release, a defendant may be held without bail if "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 USC § 3142(e)(1). In Oregon, however, even when the judicial officer has serious concerns for public safety, and even when the criminal allegations concern violent and dangerous behavior, a defendant is entitled to bail. And if a defendant has the means to post the bail, he will be released pretrial.[2]
The relevance of Oregon's right to bail to the issue of shackling is this-only incarcerated defendants are shackled. While, in theory, a trial court with security concerns could order an out-of-custody defendant shackled at the start of the day of trial, then unshackled to go home at the close of the day, in reality this does not occur.[3] No matter the security concerns they might present, or the risks of disruption they might carry, out-of-custody defendants are not shackled while they try their cases.
Undeniably, there are times where restraint of a defendant in court is necessary and proper. But the fact that shackling can be justified in some instances cannot dissipate one uncomfortable reality about our application of those shackles. Because of the stark demarcation that exists between in-custody and out-of-custody defendants, the base *536 characteristic shared amongst those who are restrained in court is not necessarily violence, or security concern, or risk of disruption-it is poverty. It is the access to wealth, and the ability to post bail, that is the most essential predictor of who will, and who will not, be shackled in Oregon.
The tension between bail and shackling that exists as a consequence of Oregon's Constitution is not present in the federal system. Accordingly, an analytical model for assessing prejudice when a defendant is shackled without an individualized basis-one that tracks the federal model in Deck , where prejudice is presumed only when the restraints are visible to the jury-may not completely address the nuances at play in Oregon.
Despite the concerns I raise, however, it is apparent that this case is not the appropriate vehicle to answer them. Stare decisis is a powerful force upon judicial decision making, promoting the important values of stability and predictability. Assoc. Unit Owners of Timbercrest Condo. v. Warren , 352 Or. 583, 598, 288 P.3d 958 (2012). This court should not disavow its precedent casually. A departure from precedent ordinarily requires a *491 thorough public vetting, by both sides, in court-a full marshalling of all the best arguments for, and against, the precedent. It is only then, when "the party seeking to change a precedent [has assumed] responsibility for affirmatively persuading us that we should abandon that precedent" that the question of whether to do so even becomes proper. Farmers Ins. Co. v. Mowry , 350 Or. 686, 692, 261 P.3d 1 (2011).
That having not occurred here, I concur.

The post-conviction court made factual findings about the use of the Band-It, noting that the device "was 2x4x7 inches in size, was contained in a sleeve and fit on [petitioner's] calf under his pant legs. The Band-It is large enough to create a visible lump under the pant leg." On appeal, however, petitioner does not argue that this "visible lump" made the restraint visible to the jury.

The trial court could, of course, impose a host of conditions on such a release. ORS 135.260 ; ORS 135.265.

And, in fact, there is testimony in this case that it was the policy of Lincoln County to only shackle in-custody defendants.